## SECURITIES AND EXCHANGE COMMISSION *v.* CENTRAL-ILLINOIS SECURITIES CORP. ET AL.

NO. 226.

Argued January 12–13, 1949.—Decided June 27, 1949.

98

*Roger S. Foster* argued the cause for the Securities & Exchange Commission. With him on the brief were *Solicitor General Perlman, Robert L. Stern, Harry G. Slater, Jerome S. Katzin* and *Myer Feldman.*

*Lawrence R. Condon* argued the cause for Streeter et al., petitioners in No. 227 and respondents in No. 266. With him on the brief was *Milton Maurer.*

*Francis H. Scheetz* argued the cause and filed a brief for the Home Insurance Co. et al., petitioners in No. 243 and respondents in No. 266.

*Alfred Berman* argued the cause for the Central-Illinois Securities Corp. et al., petitioners in No. 266 and respondents in Nos. 226, 227 and 243. With him on the brief were *Abraham Shamos, J. Howard Rossbach, Philip W. Amram* and *Herbert L. Cobin.*

*Louis Boehm* argued the cause for White et al., respondents. With him on the brief was *Raymond L. Wise.*

*W. E. Tucker* and *Paul D. Miller* were counsel for the Engineers Public Service Co.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

This case involves an amended plan filed under § 11 (e) of the Public Utility Holding Company Act of 1935 [1] by Engineers Public Service Company. The plan provided, *inter alia,* for satisfying the claims of Engineers' preferred stockholders in cash as a preliminary to distributing the

---

[1] 49 Stat. 803, 822, 15 U. S. C. § 79k (e).

remaining assets to common stockholders and dissolving the company. Broadly, the question is whether the Securities and Exchange Commission, in reviewing the plan, correctly applied the "fair and equitable" standard of § 11 (e) in determining the amounts to be paid the preferred stockholders in satisfaction of their claims.

As will appear, the ultimate effect of the Commission's determination was to allow the holders of the three series of Engineers' outstanding cumulative preferred stock to receive the call (or voluntary liquidation and redemption) prices for their shares, namely, $105 per share, $110 per share and $110 per share, rather than the involuntary liquidation preference which, for each of the three series, was $100 per share. Common shareholders oppose the allowance to the preferred of the call price value, insisting that the maximum to which the preferred are entitled is the involuntary liquidation preference of $100.

In this view the District Court and, generally speaking, the Court of Appeals have concurred, declining to give effect to the plan as approved in this respect by the Commission. Consequently we are confronted not only with issues concerning the propriety of the Commission's action in applying the "fair and equitable" standard of § 11 (e), but with the further question whether its judgment in these matters is to be given effect or that of the District Court, either as exercised by it or as modified in certain respects by the Court of Appeals.

The facts and the subsidiary issues involved in the various determinations are of some complexity and must be set forth in considerable detail for their appropriate understanding and disposition.

At the time the Public Utility Holding Company Act was enacted, the holding company system dominated by Engineers consisted of 17 utility and nonutility compa-

nies. Of these, nine were direct subsidiaries of Engineers and eight were indirect subsidiaries. Integration proceedings under § 11 (b) (1) of the Act were instituted with respect to Engineers and its subsidiaries in 1940. In a series of orders issued in 1941 and 1942 the Securities and Exchange Commission directed Engineers to dispose of its interests in all companies except either Virginia Electric and Power Company or Gulf States Utilities Company, and designated Virginia as the principal system if Engineers failed to elect between it and Gulf States.[2] At the time the plan now under review was filed Engineers had complied with the divestment orders to the extent of disposing of all its properties except its interest in Virginia, consisting of 99.8 per cent of that company's common stock, and its interest in Gulf States and El Paso Electric Company, consisting of all their common stock. Engineers' principal assets were the securities representing its interest in these companies and $14,650,000 in cash and United States Treasury securities.

Engineers had no debts. It had outstanding three series of cumulative preferred stock of equal rank: 143,951 shares of $5 annual dividend series, 183,406 shares of $5.50 series, and 65,098 shares of $6 series. As has been said,

---

[2] *Engineers Public Service Co.*, 9 S. E. C. 764; *The Western Public Service Co.*, 10 S. E. C. 904; *Engineers Public Service Co.*, 12 S. E. C. 41; *Engineers Public Service Co.*, 12 S. E. C. 268. The latter two orders were reviewed on the petition of Engineers by the Court of Appeals for the District of Columbia, which, on November 22, 1943, set aside those orders and remanded the case to the Commission for further proceedings in accordance with its opinion. *Engineers Public Service Co.* v. *Securities and Exchange Commission,* 78 U. S. App. D. C. 199, 138 F. 2d 936. On the applications of both Engineers and the Commission, this Court granted certiorari. 322 U. S. 723. We were prevented by lack of a quorum from deciding the case, and when we were advised that the partial consummation of the plan now under consideration rendered the question moot, we ordered the decision of the Court of Appeals vacated. 332 U. S. 788.

all three series had involuntary liquidation preferences of $100 per share, call prices of $105 for the $5 series and $110 for the $5.50 and $6 series, and voluntary liquidation preferences equal to the call prices.

*Proceedings before the Commission. The Plan as Originally Filed.* The plan as originally filed by Engineers provided for the retirement of all three series of preferred stock by payment of the involuntary liquidation preference of $100 per share, plus accrued dividends to the date of payment.[3] The remaining properties of Engineers were then to be distributed among the common stockholders, and Engineers was to dissolve.[4]

In order to insure adequate presentation of the views of the preferred stockholders, Engineers' board of directors authorized one of its members, Thomas W. Streeter, who was primarily interested in the preferred stock, to retain counsel partly at the company's expense. Streeter and members of his family are petitioners in No. 227. These preferred stockholders and representatives of a group of institutional investors who held preferred stock,

---

[3] The cash with which the preferred was to be paid was to consist of treasury cash on hand, cash obtained by a short-term bank loan, and $21,964,632 in cash which Engineers' common stockholders were to pay into the company's treasury in exchange for warrants entitling them to purchase one share of Gulf States' common stock at $11.50 per share, for each share of Engineers owned. The provision for the bank loan was deleted from the amended plan, by requirement of the Commission, and the cash which would have been thus obtained was to be obtained from special dividends declared by the three operating subsidiaries.

[4] After retirement of the preferred, the common stock of El Paso and Virginia (the two remaining companies whose common stock was owned by Engineers) was to be distributed among the 13,000 common stockholders of Engineers as a final liquidation dividend, after which Engineers and the system's service company were to dissolve.

the Home Insurance Company and Tradesmens National Bank and Trust Company, petitioners in No. 243, appeared before the Commission in opposition to the plan. They contended that they should receive amounts equal to the voluntary liquidation preference of the preferred.

After summarizing the issuing prices,[5] the dividend history,[6] and the market history[7] of the three series of preferreds, the Commission analyzed the assets coverage and earnings coverage of the stock. The preferred stock of Engineers represented 17.5 per cent of the consolidated capitalization and surplus of the system. That stock was junior to the 66.2 per cent of the consolidated capitalization and surplus which consisted of securities of Engineers' subsidiaries held by the public, and senior to 16.3 per cent,

[5] The $5 series was issued in March, 1928, and was sold, with a conversion privilege which had since expired, to the public at $100 per share. The $5.50 preferred was issued in October of the same year and was sold, with warrants (inoperative at the time the plan was proposed) entitling holders to purchase common stock, to the public at $99.50 per share. The $6 series was issued in September, 1930, and sold to the public at $100.

[6] Except for the period from July 1, 1933, to July 31, 1936, dividends on the preferred stock were never in arrears. The arrearages for this single period of delinquency were satisfied in 1936 and 1937.

[7] "The $5.00 series reached a high of $123.00 in 1929; its average price with the conversion privilege was $60.94; and $80.50 since the expiration of that privilege, its overall average since issue is $67.16. The $5.50 series had an average of $53.98 while its warrant right existed, and an average of $85.23 since; it reached a high of $109.00 in 1929, and its overall average since issue is $64.52. The $6.00 preferred reached its highest market price in 1945; its average price since issue is $62.77. As of February 13, 1946, the latest date covered in the hearings, the $5.00 series was selling at 105⅛, the $5.50 series at 105¾, and the $6.00 series at 109.

"Engineers common, issued in 1925, reached a high of 79⅝ in 1929 and a low of 1⅛ in 1935. On February 13, 1946 it was selling at 36." Holding Company Act Release No. 7041, p. 27, n. 45. Quotations in the text through note 11 are from this Release unless otherwise indicated.

consisting of Engineers' total common stock and surplus.

The system's average earnings coverage of fixed charges and preferred dividends for the last five years prior to the submission of the plan was 1.4 times. For these five years Engineers' average earnings coverage of preferred dividends was 1.5 times.

Certain expert testimony concerning the going-concern or investment value of the preferred stock was adduced before the Commission. Dr. Ralph E. Badger was an expert witness on behalf of certain preferred stockholders. He made a detailed analysis of the earnings and assets of Engineers and of the three series of preferred stock. He then compared Engineers and the preferred stock with relevant information concerning other comparable companies and securities.[8] He concluded that, apart from

---

[8] The Commission summarized Badger's testimony as follows: "After analyzing the earnings and assets of Engineers, he [Badger] selected for comparison the preferred stocks of five public utility holding companies which he believed to be similar to Engineers. These companies were compared with Engineers for the years 1940 to 1945 with reference to 'times all charges and preferred dividends earned,' 'proportion of prior obligations to total capitalization,' 'book value of equity per share of preferred,' 'percent of net quick assets to prior obligations' and 'times parent company dividends were earned.' It appeared that in general the position of Engineers' preferred was somewhat below the average of the five other companies until the disposition of Puget Sound in 1943. As a consequence of that disposition, its position improved to slightly over the average for those companies. Badger concluded that on an overall basis Engineers was in a median or average position as compared to the five companies studied. On the basis of a comparison of the yields of the five securities studied, he concluded that the $5.00 preferred of Engineers had an average value of $107.49 a share, the $5.50 preferred an average value of $118.31 a share, and the $6.00 preferred an average value of $129.07 a share.

"Badger also prepared a study of the preferred stocks of ten operating and holding companies selected for the similarity of their earnings to those of Engineers. These companies on an average earned all charges and preferred dividends 1.49 times in 1943, as

their call provisions and on the basis of quality and yield, the three series of preferred stock should be valued at $108.70, $119.57, and $130.33 respectively, but that because of the redemption privilege, "the present investment values are represented by their call price, plus a slight premium to account for the time required to effect a call." The fair investment values of the preferred, in view of the redemption privilege, were: $5 series— $106.25; $5.50 series—$111.38; $6 series—$111.50. No rebuttal testimony was introduced, and there was no serious challenge to Badger's conclusions that the fair investment value of each series of the preferred exceeded the call prices.

Donald C. Barnes, Engineers' president, testified that apart from the impact of § 11 of the Act and taking into account the call prices, the fair value of the preferreds, *i. e.*, "what a willing buyer would pay and what a willing seller would take in today's market for such securities," was somewhat above the redemption prices. Barnes spoke of several factors, *viz.*, possibilities of continued inflation, of depression, government competition, adverse changes in regulatory policy, or developments in atomic

against 1.40 times for Engineers. In 1944 they earned overall charges 1.48 times, as against 1.54 times for Engineers. They covered preferred dividends, 2.52 times in 1943, as against 2.48 for Engineers, and in 1944 covered preferred dividends 2.46 times, as against a similar coverage of 3.20 for Engineers. The stocks selected sold at prices to yield between 3.9 and 5.4%, or an average yield for the ten stocks of 4.5%. Badger applied this yield to the several classes of Engineers' preferred and obtained corresponding values of $111.11 for the $5.00 preferred, $122.22 for the $5.50 preferred, and $133.33 for the $6.00 preferred. Badger concluded, however, that in his opinion, and in view of the 'investment characteristics' of the company and the conditions of the money market, a proper yield for the Engineers preferred, absent a call price, would be 4.6%, so that the corresponding investment worth per share of the three series would be . . . ." the amounts stated in the text. Holding Company Act Release No. 7041, p. 30.

energy, all "common to the utility industry generally," which might have a future adverse effect on the value of Engineers preferred. Both witnesses agreed, however, as Engineers stated in its brief before the Commission, that "the present value or investment worth of these three series of stock, on a going concern basis and apart from the Act, under prevailing yields applied to comparable securities" was in excess of the call prices. Barnes also testified that the preferred stock would have been called if it had not been for the impact of § 11.

The Commission first held that "the dissolution of Engineers [was] 'necessary' under the standards of the Act." However, since such a liquidation, under *Otis & Co.* v. *Securities and Exchange Commission,* 323 U. S. 624, "does not mature preferred stockholders' claims," the so-called involuntary liquidation provision of Engineers' charter was not operative. The *Otis* case ruled "that Congress did not intend that its exercise of power to simplify should mature rights, created without regard to the possibility of simplification of system structure, which otherwise would only arise by voluntary action of stockholders or, involuntarily, through action of creditors." 323 U. S. at 638.

After announcing that in a § 11 reorganization "a security holder must receive, in the order of his priority, from that which is available for the satisfaction of his claim, the equitable equivalent of the rights surrendered," the Commission considered all the charter provisions which affected the preferred, "such as the dividend rate and the call price as well as the liquidation preferences," and analyzed the financial condition of the company "with particular regard to the asset and earnings coverage of the preferred." On the basis of the undisputed testimony the Commission found that the going-concern or investment value of the preferred was at least equal to the respective call prices. Since the call prices operated as ceilings on the value of the security by providing with respect to each

series, "a means, apart from the Act, whereby the security can be retired at a maximum price," [9] no attempt was made to determine whether the investment value of any series of preferred would exceed the call price if there were no call provision.

The Commission concluded that the payment of only $100 per share, plus accrued dividends, would not be fair and equitable to the preferred stockholders. It therefore refused to approve that provision of the plan which provided for retirement of the preferred at involuntary liquidation preferences.

Turning its attention to whether the plan was fair to the common stock, the Commission stated that, because of the accumulation of large amounts of idle cash,[10] elimination of preferred stock having fixed dividend requirements was "highly beneficial to the common." Moreover, by implementing adjustment of the system to compliance with the Act, retirement of the preferred brought the common closer to the time when it would begin receiving dividends.

Engineers contended that payment to the preferred of any amount in excess of $100 per share was unfair, because certain divestments required by the Act resulted in losses to the common stock and also eliminated the advantages of a "diversified portfolio of securities." In reply to this the Commission noted that it did not accept

---

[9] The Commission cited several of its previous opinions for support of this result: *Buffalo, Niagara & Eastern Power Corp.*, Holding Co. Act Release No. 6083; *New England Power Association*, Holding Company Act Release No. 6470; *American Power & Light Co.*, Holding Company Act Release No. 6176.

[10] At the time of the hearings the company had on hand in its treasury some $14,650,000 in idle cash, and it was estimated that by the end of 1946 this sum would reach $16,825,000. These funds had accumulated from property dispositions and retained earnings, the management having pursued a policy of withholding dividends on the common until it was satisfied that the system had made the adjustments required by the Act.

the hypothesis that losses were incurred by divestments caused by the Act,[11] and stated that the preferred claims, measured by their going-concern value, were entitled to absolute priority, and that what remained to junior security holders after satisfying this priority was necessarily their fair share.

Certain mechanical features of the plan were also disapproved by the Commission.[12]

*The Amended Plan.* Engineers then acquiesced in the Commission's determination and submitted an amended plan. In addition to meeting the Commission's mechanical objections to the original plan, the amended plan pro-

---

[11] The Commission observed: "In all of its divestments, Engineers has been free in its choice of methods, and, within limits, to choose the time for divestment. All sales have been negotiated by Engineers at arm's-length. If, as in the case of Puget Sound, the sale brought less than the carrying value on the books of Engineers, the indication is that the carrying value was excessive and not that the sales price was low. It is significant that the market price of Engineers' common when the plan was filed was the highest since 1932 and that the price has been rising steadily since 1942 when the program of simplification got under way. . . . Engineers' common reached a low of $1\frac{1}{8}$ in 1935. By 1945, when the plan was filed, it had reached a high of 37." Holding Company Act Release No. 7041, p. 34, n. 55. See also note 38 *infra*.

[12] The bank loan which the plan proposed in order to raise cash with which to pay off the preferred was found by the Commission to be unnecessary. See note 3 *supra*. Retention of $65,000,000 of Virginia stock by a trusteeship arrangement which necessitated retention of a large part of Engineers' staff was found unnecessary. All stock of Virginia could be distributed immediately upon payment of the preferred at $100 per share and creation of an appropriate escrow to protect the preferred shareholders' rights to additional payments found due. The plan was also found "incomplete and unfair" because it failed to include a provision for supervision by the Commission over the payment of fees and expenses incurred in connection with the plan.

vided for payment of the preferred stocks at their voluntary liquidation or call prices.

Over the objections of certain common stockholders, the Commission approved the plan as amended. It stated that, in the event the common stockholders continued to litigate the fairness of the plan after approval by the district court, it would be appropriate "to achieve expeditious compliance with the Act and fairness to the persons affected . . . for Engineers to make prompt payment of $100 per share and accrued dividends in order to stop the accrual of further dividends, and set up an escrow arrangement." The escrow would secure the payment of the amount in issue and also "an additional amount to provide the preferred 'for the period of the escrow a return on the amount in escrow which is measured by the return which would have been received by it if the stock remained outstanding.'" Such an escrow could be established under court supervision without returning the plan to the Commission. Holding Company Act Release No. 7119, p. 6. By later order the Commission provided for the establishment of such an escrow at the option of Engineers if it appeared likely that common stockholders would litigate beyond the district court. Holding Company Act Release No. 7190.[13]

*Proceedings in the District Court.* The Commission applied to the District Court for the District of Delaware for approval of the plan as amended. § 11 (e). Cer-

---

[13] Counsel for the Commission has taken the position in these proceedings that this provision regarding an escrow did not constitute an "amendment" to the plan, stating that "The Commission expressly refused to amend the plan and said if an escrow turns out to be necessary it can be done under the aegis of the Court, and we have viewed the escrow device simply as a device in connection with the mechanics of consummation."

Commissioner Caffrey, while joining fully in the Commission's opinion, added that Engineers, as a holding company of a single

tain common stockholders, respondents in Nos. 226, 227, and 243, and petitioners in No. 266, filed objections to the plan, contending that the Commission had erred in awarding to the preferred stockholders the equivalent of the voluntary liquidation preferences of their shares. The Streeter group of preferred stockholders objected to the Commission's finding of the appropriateness of an escrow arrangement to stop the accrual of further dividends in the event of continued litigation.

The District Court considered the case on the record made before the Commission. It preferred not to determine whether the involuntary liquidation preferences controlled, but stated that "in each case the inquiry is one of relative rights based on colloquial equity." 71 F. Supp. 797, 802. That standard, thought the court, necessitated consideration of various factors to which it was thought the Commission had attached little or no importance. Thus it was important to consider not only the charter provisions but the issuing price in terms of what the company received for the securities, and the market history of the preferred. These factors might more than offset the factor of investment value, the testimony as to which the court accepted. In any event, thought the court, several other considerations have this effect. The Act, in addition to compelling the preferred stockholders to surrender "this present enhanced value,"

utility company, would have been subject to proceedings under § 11 (b) (2) of the Act had it not come forward with a plan. Its dissolution, therefore, was a logical step following the required compliance with the Commission's orders under § 11 (b) (1), and was not voluntary. Commissioner Hanrahan concurred but thought the discussion of the investment values of the preferred wholly unnecessary, for in his view the liquidation was voluntary, and the preferred should therefore receive the voluntary liquidation preferences provided in Engineers' charter. Holding Company Act Release No. 7119.

worked hardships on the common. All classes of securities, the court said, suffered losses as a result of the divestment orders issued by the Commission under the Act. Earnings retained in the system at a sacrifice to the common contributed to the enhancement of the value of the preferred. These standards of "colloquial equity," which the District Court conceived to be controlling in our decision in *Otis & Co.* v. *Securities and Exchange Commission, supra,* compelled the conclusion that it would not be fair and equitable to give the preferred more than $100 per share. Arguments concerning the worth of the preferred in the absence of a Public Utility Holding Company Act were thought not profitable to consider *"for there is a Public Utility Holding Company Act."* In effect amending the plan to provide for payment of the preferred at $100 per share, the District Court approved the plan as thus amended. The escrow agreement prescribed by the Commission was approved, the court concluding that there was no merit in the preferred stockholders' objections to this feature. 71 F. Supp. 797.

*Proceedings in the Court of Appeals.* The Court of Appeals for the Third Circuit regarded as a central issue in the case the question whether the District Court had exceeded the scope of review properly exercised by a district court reviewing a plan under § 11 (e) of the Public Utility Holding Company Act. It concluded that the District Court was charged with the duty of exercising a full and independent judgment as to the fairness and equity of a plan, "to function as an equity reorganization tribunal within the limitations prescribed by the Act." 168 F. 2d 722, 736.

Turning to the various factors which should have been taken into consideration in arriving at the equitable equivalent to the rights surrendered by the preferred

112

shareholders, the Court of Appeals criticized the Commission for finding the investment value of the preferred as if there were no Holding Company Act while omitting to evaluate the common by the same standard, and for failing to consider factors other than the investment value. It was thought that the Commission should have estimated the future earning power of Engineers, absent a Holding Company Act, and apportioned that power between preferred and common stockholders in accordance with their respective claims. It was also thought that, in the process of valuing the preferred and the common by the same approach, the Commission should have considered "the substantial losses which occurred to Engineers by virtue of divestitures compelled by the Act." [14] Losses of this nature "should be returned to the credit side of the enterprise's balance sheet as a matter of bookkeeping." *Id.* at 737–738.

But even an investment value figure properly arrived at is "only *one* of a series of factors to be used in arriving at equitable equivalents." The Commission was required to consider "All pertinent factors and all substantial equities," which presumably included the "colloquial equities" adverted to by the District Court. *Id.* at 738.

The District Court, however, was held to have erred in one particular: it had amended the plan by substituting its own valuation of $100 per share for the preferred stock for that of the Commission. The court had no power to do this. It could only reject the Commission's valuation, and return the case to the Commission for further action in the light of the court's views.

At the time the opinion of the Court of Appeals was rendered, the plan had been consummated, with the exception of the payment of the disputed amounts in

[14] Examples selected by the court were divestitures of interests in Puget Sound Power & Light Company and El Paso Natural Gas Company. See note 11 *supra* and note 38 *infra*.

excess of the involuntary liquidation preferences of the preferred. The escrow arrangement, which had been employed to preserve the issue of the amount to which the preferred was entitled after having been approved by the Commission and the District Court, was held to be proper.

We granted certiorari because of the importance of the questions presented in the administration of the Public Utility Holding Company Act. 335 U. S. 851.

## I.

The Court of Appeals was of the view that the question of the extent of "the power conferred on the district courts . . . by the Act" was one which went "to the heart of the instant controversy." 168 F. 2d at 729. The Commission apparently took the position before that court that the District Court had erred in setting aside the agency's conclusions unless those conclusions lacked "any rational and statutory foundation." [15] This view was rejected by the Court of Appeals. Distinguishing judicial review under § 24 (a) as being limited to the inquiry whether the Commission "has plainly abused its discretion in these matters," *Securities and Exchange Commission* v. *Chenery Corp.*, 332 U. S. 194, 208,[16] the

---

[15] "The Commission takes the position before us that 'Unless the conclusions of the Commission lack "any rational and statutory foundation" they should not have been disturbed by the court below for the "fair and equitable" rule of Section 11 (e) . . . [was] inserted by the framers of the act in order to protect the various interests at stake. . . . The very breadth of the statutory language precludes a reversal of the Commission's judgment save where it has plainly abused its discretion in these matters', citing, among other authorities, Securities Comm'n v. Chenery Corp. (the second Chenery case), 332 U. S. 194, 195, at pages 207, 208." 168 F. 2d at 729. See note 16, *infra*.

[16] The Court of Appeals held that the rule of review declared in the *Chenery* case was inapplicable in the present case because *Chenery* involved a proceeding for review under § 24 (a) of the Act, while this is a proceeding under § 11 (e). But see text *infra*.

Court of Appeals held that a § 11 (e) court was charged with the duty of exercising a full and independent judgment as to the fairness and equity of a plan, "to function as an equity reorganization tribunal within the limitations prescribed by the Act." 168 F. 2d at 736.

This position is maintained before this Court by the representatives of the common stockholders. The preferred stockholders' representatives urge that the Court of Appeals erred in this regard, and that the conclusion of the Commission should not have been disturbed by the District Court, because that conclusion was supported by substantial evidence and was within the agency's statutory authority. The District Court, in their view, exceeded the proper scope of review.

The Commission apparently no longer takes so restrictive a view of the District Court's function as it formerly held. It now concedes that that court had power to review "independently" the method of valuation employed. But it urges that in this case the question, whether a proper method of valuation was employed, is one of law, since Congress has itself prescribed the standard for compensating the various classes of security holders instead of delegating to the Commission the task of fixing that standard.

In the alternative the Commission argues that "If, as the court below seemed to assume, the question is not one of law, . . . the scope of review under Section 11 (e) is limited in the same manner as that applicable to determinations of the Interstate Commerce Commission under Section 77 of the Bankruptcy Act," which is said to embody a similar statutory scheme and under which administrative determinations of valuation are sustained if supported by substantial evidence and not contrary to law. *Ecker* v. *Western Pacific R. Corp.*, 318 U. S. 448, 473; *R. F. C.* v. *Denver & Rio Grande W. R. Co.*, 328 U. S. 495, 505–509.

The problem of the scope of review which Congress intended the district court to exercise under § 11 (e) arises from and is complicated by the fact that Congress provided not one, but two procedures for reviewing Commission orders of the type now in question.

The first is afforded by § 11 (e) itself. It relates to orders approving voluntary plans submitted by any registered holding company or subsidiary for compliance with subsection (b). The Commission is authorized to approve such a plan if, after notice and opportunity for hearing, it "shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan." Then follows the provision that "the Commission, at the request of the company, may apply to a court . . . to enforce and carry out the terms and provisions of such plan. If . . . the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of section 11," the court is authorized "as a court of equity" to take exclusive jurisdiction and possession of the company or companies and their assets, and to appoint a trustee, which may be the Commission, for purposes of carrying out the plan.[17]

---

[17] The pertinent part of § 11 (e) is in terms as follows: "If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce and carry out the terms and provisions of such plan. If, upon any such application, the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of section 11, the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and

The alternative mode of review is provided by § 24 (a). It applies to all orders issued by the Commission under the Act and in abbreviated form is as follows:

> "Any person or party aggrieved by an order issued by the Commission . . . may obtain a review of such order in the circuit court of appeals . . . by filing in such court, within sixty days . . . a written petition . . . . [T]he Commission shall certify and file in the court a transcript of the record upon which the order complained of was entered. . . . [S]uch court shall have exclusive jurisdiction to affirm, modify, or set aside such order, in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure so to do. The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." [18]

provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; and the court shall have jurisdiction to appoint a trustee, and the court may constitute and appoint the Commission as sole trustee, to hold or administer, under the direction of the court and in accordance with the plan theretofore approved by the court and the Commission, the assets so possessed." 49 Stat. 822, 15 U. S. C. § 79k (e).

[18] The full text of § 24 (a) is as follows:

"SEC. 24. (a) Any person or party aggrieved by an order issued by the Commission under this title may obtain a review of such order in the circuit court of appeals of the United States within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the entry of such order, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall be forthwith served upon any member of the Commission, or upon any officer thereof designated by the Commission for that purpose, and thereupon the Commission shall

The District Court and the Court of Appeals, focusing their attention primarily on § 11 (e), emphasized the section's requirement of approval by the District Court, that court's declared status "as a court of equity," and the absence from § 11 (e) of such explicit provisions as those of § 24 (a) making the Commission's findings of fact conclusive, if supported by substantial evidence; limiting the court to consideration of objections urged before the Commission in the absence of reasonable grounds for failure to urge them; and restricting the court's consideration to the record made before the Commission in the absence of any showing requiring remand to the Commission for the taking of additional evidence.

certify and file in the court a transcript of the record upon which the order complained of was entered. Upon the filing of such transcript such court shall have exclusive jurisdiction to affirm, modify, or set aside such order, in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure so to do. The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If application is made to the court for leave to adduce additional evidence, and it is shown to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court affirming, modifying, or setting aside, in whole or in part, any such order of the Commission shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in sections 239 and 240 of the Judicial Code, as amended (U. S. C., title 28, secs. 346 and 347)." 49 Stat. 834, 15 U. S. C. § 79x.

Chiefly from these factors the two courts reached their respective conclusions that the District Court was required to exercise a full and independent judgment as to the fairness and equity of the plan, functioning as an equity reorganization tribunal within the limitations prescribed by the Act. However, they differed, as has been noted, concerning the scope of those limitations.

The District Court thought it was authorized to substitute its own judgment for that of the Commission as to whether the plan was "fair and equitable," after considering independently the various matters it denominated as "colloquial equities." Accordingly, after reaching numerous conclusions on those matters contrary to the Commission's or not given final effect in its determinations, the court arrived at an over-all judgment opposite to that of the Commission and held the plan not "fair and equitable" to the common stockholders in awarding the preferred more than $100 per share. Modifying the plan to allow the latter only that amount, the court ordered it enforced as modified.

The Court of Appeals was in general agreement with the District Court concerning its power to exercise a full and independent judgment in giving or withholding approval of the plan as "fair and equitable" and, on the whole, was in accord with the District Court's dispositions of the matters of "colloquial equity." Stressing statements appearing in the legislative history of § 11, the court thought they gave basis for a strong analogy between the functions of district courts under § 11 (e) and those of such courts "when called upon under the Sherman and Hepburn Acts to effect compulsory corporate readjustments required by the public policy expressed in those acts." [19] The court's opinion then added: "We think that it will not be contended that a district court . . . adjudging a controversy arising under the Sherman Act would function

---

[19] S. Rep. No. 621, 74th Cong., 1st Sess. 13: 168 F. 2d at 729.

other than as in an original equity proceeding, exercising all the powers and duties inherent in a court of equity under such circumstances." 168 F. 2d at 729. Accordingly, the court upheld the District Court's view that it had power, as a court of equity, to withhold approval and enforcement of the plan upon its own independent judgment of the "colloquial equities," notwithstanding the Commission's contrary judgment and, apparently, even though the Commission's judgment involved no clear error of law or abuse of discretion.

The Court of Appeals, however, viewed somewhat differently the limitations placed by the Act upon the power of review. "The proceedings before the equity reorganization court are not strictly *de novo* since the district court can only approve a plan when it has been approved by the Commission. See Application of Securities and Exchange Commission, D. C. Del., 50 F. Supp. 965, 966." 168 F. 2d at 732. The District Court, it was said, could receive evidence *aliunde* the Commission's record, could decide on that evidence and the Commission's record that the plan is unfair and inequitable, and remand the cause to the Commission for further consideration, or could remand without taking new evidence. The District Court therefore was wrong in ordering enforcement of the plan as modified by itself. It could only approve and enforce or refuse approval and remand. Only a plan approved by the Commission and by the court could be enforced.

These views were thought supported by the history of the law of reorganization, including equity receiverships, reorganization of insolvent companies under former § 77 B of the Bankruptcy Act, 11 U. S. C. § 207 *et seq.,* and Chapter X reorganizations (*id.* at § 501 *et seq.*), although the court did not "mean to imply that Congress intended to grant a Section 11 (e) court the same full and untrammeled scope that a court of bankruptcy would have in a Chapter X proceeding." 168 F. 2d at 735–736.

Nevertheless, "Any question which goes to the issue of what is fair and equitable may be raised and must be passed upon." *Id.* at 735. Moreover, since "the critical phrase employed alike by courts of equity and by Congress in framing the test under which a plan shall be approved or disapproved, has always embraced the phrase 'fair and equitable' or its substantial equivalent," the court thought that the power and functions of the district courts in review of plans submitted did not "vary much from statute to statute and from case to case," *id.* at 734, *i. e.,* whether the plan was to be consummated by way of equity receivership, by action under former § 77 B, by suit under Chapter X, by a proceeding under § 77, 11 U. S. C. § 205, or by petition to a district court under § 11 (e).

The variant views held respectively by the Commission, the District Court, the Court of Appeals, and the parties to the proceeding demonstrate the complexity of the problem. Each view has a rational basis of support, but none is without its difficulties, either in statutory terms, history and intent or in practical consequences.

The legislative history of § 11 (e) throws little light on the problem. There was, surprisingly, only casual, indeed tangental, discussion of it. The analogy to proceedings under § 77 of the Bankruptcy Act, drawn by the Commission and referred to by the Court of Appeals, rests chiefly upon the statement of Senator Wheeler, co-sponsor of the bill, made during a colloquy in debate on the Senate floor and set forth in the margin.[20] But that state-

[20] 79 Cong. Rec. 8845:

"Mr. BORAH. Mr. President, I desire to ask the Senator from Montana a question.

"On page 50, beginning with line 2, the bill provides as follows:

" 'In any such proceeding a reorganization plan for a registered holding company or any subsidiary company thereof shall not become effective unless such plan shall have been approved by the Com-

ment did not occur in any detailed consideration of the scope and incidence of judicial review. It arose only as it were incidentally in the course of extended discussion which centered about the receivership provisions of § 11 (e) as it stood at the time of the debate.

Moreover, the discussion did not and could not take account of the fact that, under our subsequent decisions in the *Western Pacific* and *Denver & Rio Grande* cases, *supra,* matters of valuation in § 77 reorganizations have been held to be exclusively for the Interstate Commerce Commission, not for the district courts, except as stated above. *Ecker* v. *Western Pacific R. Corp., supra; R. F. C.* v. *Denver & Rio Grande W. R. Co., supra.* Significantly, this fact seems not to have been taken into account when the Court of Appeals included the § 77 proceedings among its general grouping of reorganization procedures for analogical purposes. And in this respect the Commission makes clear its difference from the Court of

mission after opportunity for hearing prior to its submission to the court.'

"I do not exactly understand that language. Does it mean that the court's jurisdiction with reference to the reorganization, or what shall be permitted by decree of the court, is limited; or is it simply recommendatory to the court?

"Mr. WHEELER. We do exactly the same thing at the present time, as I understand, with reference to the Interstate Commerce Commission. A plan for the reorganization of a railroad is supposed to be submitted to the Interstate Commerce Commission for its approval before it is approved by the court. We put this provision in here in practically the same manner, as I recall, as the existing provision with reference to the Interstate Commerce Commission in the case of railroad reorganizations.

.    .    .    .    .

"The Senator from Indiana [Mr. MINTON] has called my attention to the fact that the provision does not oust the jurisdiction of the court at all, because the court has to approve the plan even though the Commission approves it. In other words there is really a double check upon the plan, and final determination rests as in the past in the courts."

Appeals, pointing out that under the *Western Pacific* and *Rio Grande* decisions the Commission decides questions of valuation, subject only to the narrow scope of review there allowed.

But, as if to complicate the matter further, the Commission's analogy is somewhat weakened by the fact that the *Western Pacific* and *Rio Grande* rulings concerning review of valuation matters rested upon language in § 77 not repeated in § 11 (e) of the Act presently in question. That language, appearing in subsection (e) of § 77, provided: "If it shall be necessary to determine the value of any property for any purpose under this section, the Commission shall determine such value and certify the same to the court in its report on the plan." This, the Court held, left to the Interstate Commerce Commission the determination of value "without the necessity of a reëxamination by the court, when that determination is reached with material evidence to support the conclusion and in accordance with legal standards." 318 U. S. at 472–473.

On the other hand, the opposing analogy drawn by the Court of Appeals from the history of the law of reorganization in general is highly indiscriminate. Insofar as it includes equity receiverships, *e. g.,* pursuant to Sherman and Hepburn Act readjustments, it ignores the important fact that in such proceedings there is no effort to brigade the administrative and judicial processes. Nor does it take account of the substantial differences "from statute to statute," *e. g.,* between proceedings under § 77 of the Bankruptcy Act as construed in the *Western Pacific* and *Rio Grande* cases, on the one hand, and Chapter X reorganizations, on the other. Moreover, and perhaps most important, it substitutes analogy drawn from other statutes and judicial proceedings, together with a reading of § 11 (e) in comparative isolation from the other provisions of the Act, for a consideration of that section in the context of the Act, as a whole and particularly with

reference to any effort toward harmonizing the section with § 24 (a) and bringing the two as close together as possible in practical operation.

Of course Congress could provide two entirely dissimilar procedures for review, depending on whether appeal were taken by an aggrieved person to a Court of Appeals or the plan were submitted by the Commission at the Company's request to a district court. But it is hard to imagine any good reason that would move Congress to do this deliberately. The practical effect of assuming that Congress intended the review under § 11 (e) to be conducted wholly without reference to or consideration of the limitations expressly provided for the review under § 24 (a) certainly would produce incongruous results which would be very difficult to impute to Congress in the absence of unmistakably explicit command.

For one thing the consequence would be, in effect, to create to a very large possible extent differing standards for administration and application of the act, depending upon which mode of review were invoked. In the one instance, apart from reviewable legal questions, the Commission's expert judgment on the very technical and complicated matters to deal with which the Commission was established, would be controlling. In the other instance, it would have to give way to the contrary view of whatever district court the plan might be submitted to.

Conceivably the same plan might be brought under review by both routes. Indeed, in one instance the District Court for Delaware, to which the plan here was submitted, held that its determination of the issues in a § 11 (e) proceeding was precluded by a prior affirmation of the same order by a Court of Appeals in a § 24 (a) review proceeding. See *L. J. Marquis & Co.* v. *Securities & Exchange Commission,* 134 F. 2d 822, and *Application of Securities and Exchange Commission,* 50 F. Supp. 965. Presumably, under the views now taken by the District Court and the Court of Appeals, if district court review

under § 11 (e) could be had first, that determination likewise would be conclusive as against contrary views held by the Commission and a Court of Appeals in a later § 24 (a) proceeding.

Moreover, apart from legal questions, the controlling standard would be fixed by the discretion of the district court to which the plan might be submitted. And since such a court might be any of the many district courts available for that purpose, there hardly could be the uniform application of the "fair and equitable" standard which Congress undoubtedly had in mind when it entrusted its primary administration to the Commission's expert judgment and experience, and when it drafted the detailed provisions of § 24 (a) for review. To the extent at least that the standard contemplated an area of expert discretion, its content under the view taken by the District Court and the Court of Appeals could not be uniform, but would vary from court to court as the judicial discretion might differ from that of the Commission or other courts.

In contrast with the specific limitations of § 24 (a), the very brevity and lack of specificity of § 11 (e), together with the paucity and tentative character of the legislative history, concerning the scope of review under the latter section, give caution against reading its terms as importing a breadth of review highly inconsistent with the limitations expressly provided by § 24 (a). Both sections are parts of the same statute, designed to give effect to the same legislative policies and to secure uniform application of the statutory standards. That statutory context and those objects should outweigh any general considerations or analogies drawn indiscriminately from differing statutes or from the history of reorganizations in general, leading as these do to incongruities and diversities in practical application of the Act's terms and policies.

Indeed we think it is fair to conclude that the primary object of § 11 (e) was not to provide a highly different scope of judicial review from that afforded by § 24 (a), but was to enable the Commission, by giving it the authority to invoke the court's power, to mobilize the judicial authority in carrying out the policies of the Act. To do this the court "as a court of equity" was authorized to "take exclusive jurisdiction and possession of" the company or companies and their assets and to appoint a trustee to hold and administer the assets under the court's direction.

True, the court was to approve the plan as fair and equitable; but nothing was said expressly as to the scope of review or the resolution of differences in discretionary matters between the Commission and the court. The court's characterization as "a court of equity" was appropriate in relation to the powers of enforcement conferred. We do not think it was intended to define with accuracy the scope of review to be exercised over matters committed to the Commission's discretion and expert judgment, not involving questions of law, or to set up a different and conflicting standard in those matters from the one to be applied in proceedings under § 24 (a). This view is not inconsistent with Senator Wheeler's comparison with § 77 proceedings under the Bankruptcy Act, which perhaps, despite its rather casual interjection, most nearly approaches disclosure of the legislative intent as to the present problem.

It may be added that, in general, the courts which have dealt with the problem appear to have taken the view we take,[21] as against the one prevailing in the District

[21] *Lahti* v. *New England Power Assn.*, 160 F. 2d 845 (C. A. 1st Cir., 1947), aff'g *In re New England Power Assn.*, 66 F. Supp. 378 (D. Mass. 1946); *Massachusetts Life Ins. Co.* v. *S. E. C.*, 151 F. 2d 424 (C. A. 8th Cir., 1945), aff'g *In re Laclede Gas Light Co.*, 57 F. Supp. 997 (E. D. Mo. 1944); *In re Electric Bond & Share Co.*,

Court and the Court of Appeals which reviewed this case,[22] although in no case has the question been so sharply focused as here. While § 11 (e), as we have noted, does not contain language the equivalent of subsection (e) of § 77 of the Bankruptcy Act upon which this Court rested its ruling concerning review of valuations in the *Western Pacific* case, that lack may be supplied in this case by the correlation we think is required between the terms of § 11 (e) and those of § 24 (a). Accordingly we are unable to accept the conclusion of the Court of Appeals and the District Court that the latter was free, in passing upon the Commission's valuations, to disregard its judgment in the large areas of discretion committed by the Act to that judgment.

Administrative finality is not, of course, applicable only to agency findings of "fact" in the narrow, literal sense. The Commission's findings as to valuation, which are based upon judgment and prediction, as well as upon "facts," like the valuation findings of the Interstate Commerce Commission in reorganizations under § 77 of the Bankruptcy Act, *Ecker* v. *Western Pacific R. Corp., supra,* are not subject to reexamination by the court unless they are not supported by substantial evidence or were not arrived at "in accordance with legal standards."

73 F. Supp. 426 (S. D. N. Y. 1946); *In re Eastern Minnesota Power Corp.,* 74 F. Supp. 528 (D. Minn. 1947); *In re Kings County Lighting Co.,* 72 F. Supp. 767 (E. D. N. Y. 1947), aff'd *sub nom., Public Service Commission of N. Y.* v. *S. E. C.,* 166 F. 2d 784 (C. A. 2d Cir., 1948); *In re New England Public Service Co.,* 73 F. Supp. 452 (D. Me. 1947).

[22] *In re Community Gas & Power Co.,* 168 F. 2d 740 (C. A. 3d Cir., 1948), aff'g 71 F. Supp. 171 (D. Del. 1947); *In re North West Utilities Co.,* 76 F. Supp. 63 (D. Del. 1948); *In re Interstate Power Co.,* 71 F. Supp. 164 (D. Del. 1947); accord, *Illinois Iowa Power Co.* v. *North American Light & Power Co.,* 49 F. Supp. 277 (D. Del. 1943); but see *In re Standard Gas & Electric Co.,* 151 F. 2d 326 (C. A. 3d Cir., 1945), reversing 59 F. Supp. 274 (D. Del. 1945).

Administrative determinations of policy, often based upon undisputed basic facts, in an area in which Congress has given the agency authority to develop rules based upon its expert knowledge and experience, are exemplified by *Securities and Exchange Commission* v. *Chenery Corp., supra,* in which the Commission determined that preferred stock purchased by management in the over-the-counter market during the formulation of a holding company reorganization plan could not be exchanged for common stock participation in the reorganized company, as could other preferred stock; instead management was to be paid cost plus interest for the preferred stock so purchased.

The Commission's determination was made in the exercise of its duty to determine that a plan is "fair and equitable" within the meaning of § 11 (e) and that it is not "detrimental to the public interest or the interest of investors or consumers" within the meaning of § 7 (d) (6) and § 7 (e). On certiorari to the Court of Appeals which had reviewed the Commission's order under § 24 (a) of the Act, we held that the Commission's action was "an allowable judgment which we cannot disturb." 332 U. S. 194, at 209. This holding was not based upon the fact that the Commission's order was reviewed under § 24 (a) of the Act rather than under § 11 (e), but upon the ground that the Commission's determination was made in an area in which Congress had delegated policy decisions of this sort to the Commission, and therefore that the agency determination was "consistent with the authority granted by Congress." *Id.* at 207. We think this view is applicable when review is had under § 11 (e) as much as when it arises under § 24 (a).

Even with the latitude allowed by our present ruling for play of the Commission's judgment, it remains to consider whether in this case the Commission has com-

plied with the statutory standards in its determination that the plan as amended by it is fair and equitable. The common shareholders deny this. And, contrary to the preferred shareholders' position, the Commission has argued, alternatively to its contentions concerning the scope of review, that application of the "fair and equitable" standard of § 11 (e) in this case presents questions of law which have been decided erroneously by the District Court and the Court of Appeals.

Taken most broadly, this argument of the Commission seems to be that the entire matter of applying the "fair and equitable" standard involves only legal issues, with the result that each subsidiary question raised and determined in that process becomes independently reviewable and judicially determinable. If so, of course, the question of the proper scope of review would become irrelevant, at any rate for the purposes of this case, since it was determined solely on the record made before the Commission.

But the Commission does not stop with this broad argument. It goes on to consider particular questions which arose in the valuation process and to urge that they presented questions of law which the reviewing courts erroneously determined. Among these are whether the court's dispositions violated the "absolute priority" standard attributed to the *Otis* case; whether their requirement that the Commission value the common stock in the same manner as it did the preferred, rather than simply awarding to the common shareholders all of Engineers' assets remaining after giving the preferred the equitable equivalent of their shares as determined, violated the statutory standard; whether the courts rightly required the Commission to take into account alleged losses incurred by Engineers in earlier dispositions of company properties made to comply with the Act; and whether the Commission improperly failed to take into

account other matters of "colloquial equity" the courts considered not only proper but essential to a fair and equitable determination.

We think at least some of these matters do raise legal issues, particularly in the light of the *Otis* decision, which should now be considered and resolved. Accordingly we turn to them for that purpose.

## II.

*Challenges to the Investment Value Theory of Valuation.* The principal effect of the *Otis* decision was to rule that in simplification proceedings pursuant to §§ 11 (b) (2) and (e) of the Act the involuntary charter liquidation preference does not of itself determine the amounts shareholders are to receive, but instead the amounts allocated should be the equitable equivalent of the securities' investment value on a going-concern basis.

The common shareholders seek to avoid the effect of this ruling by various arguments presently to be stated, which should be considered and determined in the light of the *Otis* decision and the Commission's practice consistent with that decision, a summary of which practice is set forth in the Appendix to this opinion.

In the *Otis* case the plan called for the dissolution of the United Light and Power Company, the top holding company in the system, in obedience to a Commission order requiring the elimination of that company, whose existence violated the "great-grandfather clause" of § 11 (b) (2). Since both common and preferred stockholders were to receive, in exchange for their stock in United Power, stock in its subsidiary, the United Light and Railways Company, which was itself a holding company, the effect of the dissolution was to eliminate the top holding company in a multi-tiered holding company system, leaving both classes of security holders with an investment in a continuing holding company enterprise.

The assets of United Power were insufficient to satisfy the claims of the company's preferred stockholders, if the charter liquidation preference of the preferred was applicable. The Commission found however that "if all the assumed earnings materialized and were applied to liquidating the preferred current and deferred dividends, in approximately fifteen years the arrearages would be paid and the common would be in a position to receive dividends," 323 U. S. at 632, and that only by forced liquidation could the common be deprived of all right to future earnings and the preferred be given the right to prospective earnings in excess of the dividends guaranteed by charter. The Commission concluded that "in its 'over-all judgment' Power's common had a legitimate investment value of a proportion of 5.48 per cent of Power's assets to the preferred's value of 94.52 per cent." *Ibid.* Relying on the legislative history of the Act, 323 U. S. at 636–637, and upon the fact that the charter provision was not drafted in contemplation of the legislative policy embodied in the Act, *id.* at 637–638, we held that the Commission had not erred in its method of valuation. By this ruling we rejected the easier solution of permitting liquidations or reorganizations compelled by the Act to mature charter rights and thus to shift investment values from one class of security holders to another.

In so ruling, this Court did not abandon the "absolute priority" standard insofar as embodied in the requirement that the plan be "fair and equitable." [23] That standard requires that each security holder be given the equitable equivalent of the rights surrendered, but the equitable equivalent is not invariably the charter liquida-

---

[23] *Group of Investors* v. *Chicago, M., St. P. & P. R. Co.,* 318 U. S. 523, 565; *Northern Pacific R. Co.* v. *Boyd,* 228 U. S. 482; *Case* v. *Los Angeles Lumber Products Co.,* 308 U. S. 106; *Consolidated Rock Products Co.* v. *Du Bois,* 312 U. S. 510; *Marine Properties* v. *Manufacturers Trust Co.,* 317 U. S. 78; *Ecker* v. *Western Pacific R. Corp.,* 318 U. S. 448; *Otis & Co.* v. *S. E. C.,* 323 U. S. 624, 634.

tion preference, as it is in the case of liquidations or reorganizations brought about through the action of creditors or stockholders. The principle of the *Otis* case is that the measure of equitable equivalence for purposes of simplification proceedings compelled by the Holding Company Act is the value of the securities "on the basis of a going business and not as though a liquidation were taking place." 323 U. S. at 633.

The decisions of the Commission, from the commencement of its enforcement of the Public Utility Holding Company Act to the present time, show a consistent and developing application of the investment value rule approved in the *Otis* case.[24] At least since its decision in that case charter provisions have been held invariably not to be determinative. Federal courts which have had occasion to speak in this connection have recognized that charter liquidation provisions are not the measures of stockholders' rights in liquidations and reorganizations compelled by the Act.[25]

Seeking to distinguish the *Otis* case, the representatives of the common stockholders contend that here the charter liquidation provisions are applicable, from which of course it would follow that those provisions are the measure of equitable equivalence.

It is urged first that Engineers' charter liquidation provision is phrased in more comprehensive terms than was the one in *Otis*, and that the framers of Engineers' charter

[24] See the Appendix to this opinion, *post,* p. 155.

[25] *Massachusetts Mutual Life Insurance Co.* v. *Securities and Exchange Commission,* 151 F. 2d 424, 430. The Court of Appeals in this case agreed that charter provisions were not determinative, 168 F. 2d at 736. While the district judge declined to decide whether the involuntary liquidation preference applied in this case, he has elsewhere indicated his awareness that charter provisions do not control in liquidations compelled by the Act. *In re Consolidated Electric & Gas Co.,* 55 F. Supp. 211, 216; *In re North Continent Utilities Corp.,* 54 F. Supp. 527, 530–531.

contemplated the possibility of governmental action of the kind required by the Holding Company Act. A comparison of the two charter provisions reveals no significant difference between them.[26] Engineers' charter was drafted some four years earlier than the *Otis* charter. Each contract was made at a time when the legislative policy embodied in the Holding Company Act "was not foreseeable." 323 U. S. at 638.[27]

A further asserted distinction is that there is here a "genuine liquidation," *i. e.,* a termination of the holding company enterprise by the liquidation of the last holding company in the system; while in the *Otis* case "the holding company enterprise continued essentially unchanged, even though the particular corporation there involved was being dissolved pursuant to the mandate of the Act, as an incident to the simplification of the continuing system."

It would probably suffice to observe that the word "liquidation," as used in Engineers' charter liquidation provision, quite obviously means liquidation of Engineers, not liquidation of other corporations or of the holding company enterprise of which Engineers is a part. But there are more fundamental reasons which require the rejection of this argument. The legislative history relied

---

[26] Engineers' charter provides that preferred shareholders shall receive $100 per share, plus accrued dividends, "In the event of any liquidation, dissolution or winding up of this Corporation." In *Otis* the liquidation preference was payable "Upon the dissolution or liquidation of the corporation, whether voluntary or involuntary." 323 U. S. at 630, n. 6.

[27] The conclusion that liquidation compelled by governmental edict was not foreseen at the time Engineers' charter was drafted is reenforced by a statement appearing in the record, made by counsel for Engineers, one of the draftsmen of the charter, apparently in connection with another case, that a § 11 liquidation "is an arbitrarily and forced statutory termination of the enterprise, and it has no relation whatsoever to any factors which the parties could have had in mind when they entered the enterprise."

upon in the *Otis* case, 323 U. S. at 636–637, contains no hint that Congress intended to preserve investment values only when the policy of the Act required a reduction in the number of holding companies in a system rather than the elimination of the system's last holding company.[28] And the *Otis* opinion rejected the Commission's argument in that case that the result there was justified by the fact that the holding company enterprise was to continue. We said that the reason for the inapplicability of charter provisions

> "does not lie in the fact that the business of Power continues in another form. That is true of bankruptcy and equity reorganization. It lies in the fact that Congress did not intend that its exercise of power to simplify should mature rights, created without regard to the possibility of simplification of system structure, which otherwise would only arise by voluntary action of stockholders or, involuntarily, through action of creditors." 323 U. S. at 638.

---

[28] The common stockholders contend that the repeated references in the legislative history of the Holding Company Act to *Continental Insurance Company* v. *United States,* 259 U. S. 156 (S. Rep. No. 621, 74th Cong., 1st Sess. 33; H. R. Rep. No. 1318, 74th Cong., 1st Sess. 49–50; 79 Cong. Rec. 4607, 8432) "leave no doubt that at least when a genuine liquidation is compelled by the Act," charter provisions were intended to control. But these congressional references to the *Continental* case were in support of propositions other than that charter liquidation provisions are applicable to liquidations compelled by the Act. The *Otis* opinion pointed out that the *Continental* case "turned . . . on the charter rights of the preferred to share equally with the common in earnings which had become assets, . . . not on whether a right to share was matured or varied by governmental action." 323 U. S. at 639. The opinion proceeds to refute expressly the contentions made by the common stockholders here: "We do not feel constrained by [the *Continental* case's] dealing with charter rights as in a normal liquidation to hold that where liquidation is adopted as a matter of administrative routine, the preferences are thereby matured." *Ibid.*

Far from aiding the distinction urged by the common stockholders, *Schwabacher* v. *United States,* 334 U. S. 182, supports the conclusion that investment values rather than charter provisions provide the measure of the preferred stockholders' rights. In that case the Court held that the charter liquidation provision of a railroad corporation merging with another railroad under § 5 of the Interstate Commerce Act was not determinative of the amount to which holders of cumulative preferred stock were entitled, and that "In appraising a stockholder's position in a merger as to justice and reasonableness, it is not the promise that a charter made to him but the current worth of that promise that governs, it is not what he once put into a constituent company but what value he is contributing to the merger that is to be made good." 334 U. S. at 199.

Again this result depended, not upon the fact that the merger left a continuing enterprise, but upon the fact that Congress, in its efforts to achieve a particular economic goal, wished to avoid shifting investment values from one class of securities to another by maturing contract rights which would not otherwise have matured. As did the *Otis* opinion, which was said to construe "a federal statute of very similar purposes," [29] the *Schwabacher* opinion

---

[29] The *Otis* case was described as follows: "In construing the words 'fair and equitable' in a federal statute of very similar purposes, we have held that although the full priority rule applies in liquidation of a solvent holding company pursuant to a federal statute, the priority is satisfied by giving each class the full economic equivalent of what they presently hold, and that, as a matter of federal law, liquidation preferences provided by the charter do not apply. We said that, although the company was in fact being liquidated in compliance with an administrative order, the rights of the stockholders could be valued 'on the basis of a going business and not as though a liquidation were taking place.' Consequently the liquidation preferences were only one factor in valuation rather than determinative of amounts payable." 334 U. S. at 199.

assumed "that Congress intended to exercise its power with the least possible harm to citizens." *Otis & Co.* v. *Securities and Exchange Commission, supra* at 638.

The final reason for rejecting the asserted distinction between liquidation of the particular corporation and liquidation of the holding company enterprise serves also to answer a further, related argument made by the representatives of the common stockholders. It is said that payment of the preferred stockholders in cash rather than in securities of a new corporation and the consequent termination of these stockholders' investment "matures" the preferred claims and makes this a "genuine liquidation." These arguments, which necessarily imply that the Commission may not choose the elimination of one company in a system rather than another or payment in cash rather than securities as means of conforming the enterprise to the requirements of the Act, without varying the standard by which stockholders are to be compensated, are answered in the *Otis* opinion. We held there that security values should not

> "be made to depend on whether the Commission, in enforcing compliance with the Act, resorts to dissolution of a particular company in the holding company system, or resorts instead to the devices of merger or consolidation, which would not run afoul of a charter provision formulated years before adoption of the Act in question. The Commission in its enforcement of the policies of the Act should not be hampered in its determination of the proper type of holding company structure by considerations of avoidance of harsh effects on various stock interests which might result from enforcement of charter provisions of doubtful applicability to the procedures undertaken." 323 U. S. at 637–638.

The common stockholders argue also that, even if the charter liquidation provision be deemed inapplicable, the "fair and equitable" standard requires the application of the "doctrine of frustration." It is said that frustration of a contract by governmental edict or any other supervening event not contemplated by the parties requires that "the loss . . . lie where it falls. Neither party can be compelled to pay for the other's disappointed expectations." [30] In such a case, it is said, "the face amount of the security—which theoretically mirrors the senior security holder's contribution to the enterprise—is all that he is entitled to recover." Again the *Otis* case is said to be distinguishable in that there the preferred stockholders were to receive a participation in the continuing enterprise, while here their investment is terminated by payment in cash. But, as we observed above, the Commission is not to be hampered in its enforcement of the policies of the Act "by considerations of avoidance of harsh effects on various stock interests."

The authorities relied upon in support of the frustration argument would not compel the result for which the common stockholders contend, even in the absence of the *Otis* decision. Considerable reliance is placed upon *The United Light & Power Co.,* 10 S. E. C. 1215, and the affirmance of that decision by the Court of Appeals for the Second Circuit in *New York Trust Co.* v. *Securities and Exchange Commission,* 131 F. 2d 274. In that case the plan, a different feature of which was reviewed in the *Otis* case, provided for payment to the company's debenture holders in cash. The Commission, after deciding that voluntary liquidation preferences were not payable, and that the bondholders had no right to receive the premium "by virtue of any other recognized legal or

---

[30] American Law Institute, Restatement, Contracts § 468, comment on subsection (3).

equitable principle," held that there was no right to compensation for the termination of the investment, which, like the termination of the stockholders' investments, had been "brought about by the act of a sovereign power—in this case a congressional mandate." 10 S. E. C. at 1223, 1228. In affirming the Commission's determination, the Court of Appeals held that "the contract is no longer binding and further performance is excused. . . . where, as here, the essential existence of one of the parties to a contract has become illegal and impossible because contrary to a new concept of public policy which was unforeseeable when the contract was made." 131 F. 2d at 276. Since the corporation was under no obligation to call the bonds, "it might well let the rights of those in interest be determined as though there had been no call option. The order under review was, accordingly, fair and reasonable to all parties in interest since it provided for the payment of the bonds in a way which discharged in full the contract obligations of the dissolved corporation." *Ibid.*

Even if it is assumed that no distinction is to be made between bonds and preferred stock,[31] neither the decision of the Court of Appeals nor that of the Commission in the *New York Trust* case is inconsistent with the later *Otis* decision or with the position of the Commission in

[31] The analogy between bonds and preferred stock, cf. 2 Dewing, The Financial Policy of Corporations 1247, n. r. (4th ed., 1941), is subject to obvious limitations. For example, if the claims of bondholders rather than preferred stockholders had been in issue in the *Otis* case, United Power would have been an insolvent rather than a solvent corporation and so subject to bankruptcy. At least with reference to the issue of whether amounts in excess of the face value of a security are payable, we need not distinguish between treatment to be accorded bonds and preferred stock. The Commission's tendency has been to treat both the same. See, e. g., *The United Light & Power Co.*, 10 S. E. C. 1215, 1226–1227; *Cities Service Co.*, Holding Company Act Release No. 4944.

this case, insofar as each holds that performance of the charter contract is excused.[32]   Engineers is no longer required by its contract either to continue the payment of preferred dividends beyond the dissolution date provided in the plan or to redeem the preferred at either voluntary or involuntary charter liquidation prices.

Moreover the *New York Trust* case need not be construed to fix the measure of the senior security holder's claim at the face amount of his security.   In *Massachusetts Mutual Life Insurance Co.* v. *Securities and Exchange Commission,* 151 F. 2d 424,[33] the Court of Appeals for the Eighth Circuit recognized that the doctrine of impossibility or frustration applied in the *New York Trust* case excused the corporation from its contractual obligations and agreed with the Commission that it would not be fair and equitable to pay redemption premiums in the circumstances of that case.   But the Court observed that "whether, upon retirement of outstanding bonds . . . payment of principal, accrued interest, *and* redemption premiums is the equitable equivalent of the bondholders' rights depends upon the facts of each particular case."   151 F. 2d at 430.[34]

---

[32] The citation by the *Otis* majority, "Compare *New York Trust Co.* v. *Securities & Exchange Commission,* 131 F. 2d 274; *In re Laclede Gas Light Co.,* 57 F. Supp. 997," is of no assistance to the common stockholders here, for it is in support of and directly following the sentence: "Where pre-existing contract provisions exist which produce results at variance with a legislative policy which was not foreseeable at the time the contract was made, they cannot be permitted to operate."   323 U. S. at 638.

[33] Affirming *In re Laclede Gas Light Co.,* 57 F. Supp. 997.

[34] Two other decisions in the courts of appeals, which cite and purport to follow the *New York Trust* case, reason that the premium is payable only in the event of voluntary redemption of the bond, that the redemption is not voluntary, and therefore that the premium is not payable.   Since this syllogism disposes of each case without reference to the doctrine of frustration, the frustration rationale of

The doctrine of impossibility or frustration explains the conclusion that the corporation is excused from performing its contract, but it does not provide a measure of the security holders' claims. For that measure, we must look to the intention of Congress, as we did in the *Otis* case.

## III.

*Application of the Investment Value Theory: The Commission's Alleged Failure to Take Account of Prior Divestment Losses Sustained by Engineers; Its Alleged Failure to Value the Common Stock by the Same Method as Was Used in Valuing the Preferred; "Colloquial Equities."* It was the Commission's duty in passing upon the fairness and equity of the plan to accord each security holder, in the order of his priority, the investment or going-concern value of his security. Here, as in the *Otis* case, the manifest solvency of Engineers "simplifies the problem of stockholders' rights . . . . The creditors are satisfied." 323 U. S. at 633–634. Valuation on the basis of a going concern necessarily has primary relationship to value as of the time the shareholders' surrender becomes effective, not as of some earlier, remote period or one long afterward. Moreover,

> "Like the bankruptcy and reorganization statutes, the Public Utility Holding Company Act, in providing that plans for simplification be 'fair and equitable,' incorporates the principle of full priority in the treatment to be accorded various classes of security interests. This right to priority in assets which exists between creditors and stockholders, exists also between various classes of stockholders. When by contract as evidenced by charter provisions

---

the *New York Trust* case is an alternative ground in both cases. *City National Bank & Trust Co.* v. *S. E. C.*, 134 F. 2d 65; *In re Standard Gas & Electric Co.*, 151 F. 2d 326.

140

one class of stockholders is superior to another in its claim against earnings or assets, that superior position must be recognized by courts or agencies which deal with the earnings or assets of such a company. Fairness and equity require this conclusion." [35]

These are the governing principles to be applied in consideration of the differences between the Commission and the reviewing courts concerning the matters listed in the heading of this paragraph. It is important to note that the doctrine of allowing equitable equivalents of present going-concern value to replace stated charter liquidation value as the measure of security satisfaction did not and was not intended to destroy charter or contract right to priority of satisfaction.

A. The investment value or going-concern value theory rests upon the premise that Congress intended to exercise its power to simplify holding company systems and to remove uneconomic companies without destroying legitimate investment value. It is consistent with this premise that the investment value determined by the Commission be the investment value the securities would have if it were not for the liquidation required by the Act. This does not mean, however, that the agency must value the stock as if the Act had never affected the holding company system of which the particular company dealt with in the plan is a part.[36] When the Commission values a security interest by determining the value that interest would have if it were not for the present liquidation or reorganization required by the Act, it substantially complies with the statutory mandate.

[35] 323 U. S. at 634. See also the quoted statement of the Commission's views, as opposed to those of Commissioner Healy, set forth id. at 635, n. 17; Holding Company Act Release No. 4215, p. 12.

[36] The Court of Appeals took the Commission's method to be valuation "as if the Act had never been passed." It criticized the Commission for valuing the preferreds on this basis but not valuing the common in the same manner. 168 F. 2d at 737-738.

There are at least two sufficient reasons, both of which are illustrated by the present case. It would be administratively impossible, in determining the investment value of securities in a corporation being liquidated, to reevaluate every transaction in the gradual simplification of the system of which the company is a part, as if the Act had never been passed.[37] If the Commission were required to reconstitute Engineers' balance sheet as if the Act had never been passed, it would be necessary, for example, retroactively to evaluate the economic consequences of the compelled divestment of Engineers' interest in Puget Sound Power and Light Corporation in 1943 and to determine whether and to what extent Engineers would have gained or lost by retaining its interest in Puget Sound to the present time.[38] The difficulties of

---

[37] The Court of Appeals thought that, if the Commission wished to value the securities "*ex* the Act, losses of the sort referred to in this paragraph must be weighed into the calculation, i. e., such losses should be returned to the credit side of the enterprise's balance sheet as a matter of bookkeeping." 168 F. 2d at 738.

[38] In the Puget Sound reorganization Engineers received as of 1943 approximately a 3% interest in the new common stock in return for its old 99.3% common stock interest. The old common was estimated to be 18 to 34 years away from dividends in the absence of a reorganization. 13 S. E. C. 226. As in the *Otis* case, the controversy was over the question of whether Engineers was entitled to any participation in the new company, in view of the remote and contingent character of its earnings expectations. Engineers subsequently sold the interest it received in the reorganization for $764,765.

The Court of Appeals' conclusion that Engineers lost through the Puget Sound divestment is based upon the premise that actual earnings of the new company were considerably higher during 1946 and the first half of 1947 than the estimated earnings upon which the Commission based its reorganization allowance to Engineers. 168 F. 2d at 737, citing Moody's Public Utility Manual (1947) 53, and Supp. Vol. 19, at 1914.

The Commission correctly observes that this is an oversimplification of the complex problems involved in the valuation of Engineers' interest in Puget Sound and of the relationship between

going through such a procedure, multiplied by the number of divestments compelled by the Act over many years,[39] would be insuperable.

---

that interest in 1943 and its hypothetical value today if no recapitalization and divestment had occurred. It notes that the earnings figures taken from Moody's fail to reflect the use of a much lower depreciation allowance that the Commission thought appropriate in making its earnings estimate, capital expenditures since 1943, and divestment of certain properties after Puget Sound had ceased to be subject to the Act. The period taken by the Court of Appeals can hardly be assumed to provide a reliable average earnings figure. Absent the impact of the Act, recapitalization of Puget Sound would probably have been necessary in the exercise of sound business judgment, a consideration which imports numerous additional uncertainties. Further, the evaluation of the Puget Sound divestiture required by the Court of Appeals would compel the Commission to estimate the effects of Engineers' hypothetical lack of the $764,765 received from the sale of the securities received in the Puget recapitalization, funds which were actually used to purchase additional interests in other companies and to make payments to Engineers' preferred stocks. Certain tax advantages derived from the sale of Puget would have to be taken into account.

The Court of Appeals also cited the El Paso Natural Gas Company divestiture as an example of a loss to Engineers caused by the Act, saying, "Under this divestiture Engineers lost a profit of at least $4,000,000." 168 F. 2d at 737. In 1931 Engineers loaned El Paso $3,500,000 and received in return $3,500,000 in bonds and an option to purchase 192,119 shares of El Paso's common stock. As a result of the exercise or assignment of some of these options and the resale in 1936, 1937 and 1944 of stock acquired by their exercise, Engineers realized a profit, in addition to the repayment of the loan, of $2,700,000 on its El Paso investment. The statement that these transactions involved a loss of $4,000,000 to Engineers is based upon the assumptions that the timing of the sales was compelled by § 11 and not by managerial judgment, that in the absence of § 11 management would have sold the stock at the very peak of the market, and upon other equally dubious premises.

[39] Engineers' system consisted of 17 companies before the Commission began its integration proceedings. See note 2 and text, *supra*.

The second reason lies in the basis for the *Otis* rule itself. Since Congress intended that investment values should be preserved in each liquidation or divestiture required by the Act, we may assume that it intended the Commission to value securities in a particular liquidation as if that liquidation were not taking place, but not as if the Act had never been passed; for, if investment values have been preserved in the early divestitures, it is useless to reconstitute the balance sheet as if the divestitures had not taken place. The Commission's determinations upon which the various divestiture orders were based may not be collaterally attacked.

B. We have observed that the standard of compensation to be accorded security holders does not depend upon whether their security interests are to be retired by exchanging them for new securities in a continuing enterprise or by payment in cash. However, these different methods of compensating the security holder determine which of varying methods of arriving at investment value will be employed by the Commission. Where the security holder is to receive new securities, the Commission is faced with a dual valuation problem. It must evaluate the security to be surrendered and the securities to be received in exchange. Recognizing the inherent complexity of this problem, this Court has held that a security holder may be accorded the equitable equivalent of the rights surrendered without placing a dollar valuation upon either the rights surrendered or the securities given in compensation therefor.[40] In the *Otis* case, in which the plan contemplated compensating both preferred and common stockholders of United Power in common stock of Power's sole subsidiary, the Commission

---

[40] *Ecker* v. *Western Pacific R. Corp.*, 318 U. S. 448, 482–483; *Group of Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523, 565–566; *Otis & Co.* v. *Securities and Exchange Commission*, 323 U. S. 624, 639–640.

was required to apportion the Power common between the two classes by evaluating the expectation of income from the new stock and the risk factor of that stock in relation to the rights being surrendered. In effect the Commission's task was to apportion to the new stock earning power substantially equivalent to that surrendered.

But when the claims of the senior security holders are to be satisfied by payment in cash, the Commission appropriately varies its approach. In such a case it holds that "the most workable hypothesis for finding a fair equivalent between cash received and the security surrendered under the compulsion of the plan, is that of reinvestment in a security of comparable risk." The question to which the Commission seeks the answer is, "How much money would it cost the preferred stockholders to replace their securities with comparable ones?"

Badger sought to provide an answer to this question by deriving from his analysis and comparison a proper yield basis for Engineers' preferred,[41] which, taking into account the effect of the risk factor, he found to be 4.6%. Capitalization of this rate gave the preferreds values ranging from $108.70 per share to $130.33 per share, amounts well in excess of the call prices. The testimony of Engineers' president, Barnes, as to "what a willing buyer would pay and what a willing seller would take in today's market for such securities," absent a Public Utility Holding Company Act, coincided with that of Badger, as to the estimated going-concern value in cash of the preferred.[42]

The Commission did not rely exclusively on this expert testimony but made its own study of the market and

---

[41] Badger's analysis, as summarized by the Commission, is stated in note 8, *supra.*

[42] See text *supra,* paragraph following note 8.

dividend history and the earnings coverage and assets coverage of the preferred. This served not only as a check upon the accuracy of Badger's premises but as a basis for the Commission's exercise of its independent judgment. The Commission found it unnecessary to make its own independent estimate of the dollar value of the preferred stock, absent a Holding Company Act.[43] When it became apparent that the going-concern value would exceed the call prices of the stocks by a considerable amount, the exact going-concern value became immaterial, because the call price, at which the corporation could always retire the preferred without reference to the Act, marked the limits of the preferreds' claims.

The common stockholders contend that this method of valuation, as employed in this case, produced only "a hypothetical market value of the preferreds based on market prices as of the time when the testimony of Badger and Barnes was given (the first few months of 1946)." They criticize Badger, whose evidence was undisputed and was accepted by the Commission, for failing to employ, as a basis for comparison, median prices and

---

[43] The Court of Appeals stated that the Commission erred in failing to "give any substantial consideration to the future earning power of Engineers and its subsidiaries which the Supreme Court has held is one of the fundamental tests for reorganization valuation." 168 F. 2d at 736–737. A precise finding as to prospective earnings of a continuing Engineers would be the controlling subsidiary finding upon which a precise finding as to going-concern value *"ex* the Act" would be based. See *Group of Investors* v. *Chicago, M., St. P. & P. R. Co.,* 318 U. S. 523, 540; *Consolidated Rock Products Co.* v. *Du Bois,* 312 U. S. 510, 525; 6 Collier, Bankruptcy 3849–3855 (14th ed., 1947). But where it is clear that the prospective earnings of the corporation would be more than enough to continue payment of preferred dividends and to carry the going-concern value, absent call provisions, well above the call price, there is no necessity for making a precise forecast of future earnings, for the call price marks the ceiling. Cf. *Ecker* v. *Western Pacific R. Corp.,* 318 U. S. 448, 479–483.

yields of the securities chosen for comparison, computed on the basis of prices covering a representative period of time; they complain that the low yield rates and high market levels of January, 1946, were abnormal. And it is said that the Commission and Badger failed properly to evaluate Engineers' economic future, absent a Holding Company Act, *i. e.*, failed to make "a prediction as to what will occur in the future, an estimate . . . based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance." *Consolidated Rock Products Co.* v. *Du Bois,* 312 U. S. 510, 526.

We may concede that, even though the preferred is to be paid in cash and thus should receive cash sufficient to purchase a comparable investment with a comparable yield, the Commission would be wrong in selecting, as a basis for valuation, abnormal or highly speculative market values of a transient nature. But this was not done. Badger stated that "The prices of preferred stocks today are predicated on fundamental conditions prevailing in the money markets, conditions which are of a permanent nature." He added that the values he placed upon the preferreds were "values of a permanent nature and . . . not values of a temporary or speculative nature." [44] His conclusion was supported by a summary

---

[44] The District Court made a finding with respect to Badger's conclusion as to the permanence of the current yield rate and concluded that "The extremely low money rates which resulted in Badger's finding that the preferred stocks of Engineers have an 'investment value' greater than $100 per share, largely reflect artificial factors which are clearly subject to changes at any time and may well be of purely transitory character." It is difficult to reconcile this "finding" with the following statement which appears in the court's published opinion: "I accept Dr. Badger's values and,

of the pertinent economic considerations, including the effects of Government financing and the large Government debt, together with a comparison of yields of Government bonds, high grade corporate bonds, and high grade preferred stocks from 1932 to 1945. Finally, Badger's analysis of Engineers' economic status, absent a Holding Company Act, of Engineers' preferred, and of comparable securities of other companies was thorough and adequate.

The Commission made its own independent study of Engineers' economic record. In evaluating Badger's testimony regarding the quality of Engineers' preferreds, the proper yield basis for the stock, and economic considerations underlying the prediction that current yields and price levels were relatively permanent, the Commission exercised its informed and expert judgment. At the time it passed upon the plan it was able to say that "no serious challenge was made in the proceedings to Badger's conclusion that the fair investment value of the preferred on a going concern basis is in excess of the call price." Holding Company Act Release No. 7041, p. 31. Engineers, in its brief before the Commission, conceded that "these amounts ($106.25, $111.38, $111.50, respectively) are substantially the present value or investment worth of these three series of stock, on a going concern basis and apart from the Act, under prevailing yields applied to comparable securities." *Ibid.* The Commission's determination that the investment values of the preferreds were in excess of their call prices has ample support in the record.

in the absence of a showing of changed circumstances, I shall assume that those values are applicable at the present time." 71 F. Supp. at 801. At any rate, this is predominately a question of fact, and the Commission's determination, supported as it was by substantial evidence, should not have been disturbed, absent supervening economic developments prior to the consummation of the plan which clearly required reconsideration.

But the common stockholders contend that a drop in yield rates, caused by a lowering of support levels of Government securities, should be taken into consideration by this Court in appraising the Commission's determination. Any changes which had occurred since the date of consummation would of course be irrelevant, for the preferred stockholders could not be required to surrender their investment and their advantageous dividend rate and yet remain subjected to the risk of fluctuation in the value of their erstwhile investment. But the common stockholders have failed to show that the investment values of the preferreds have fallen below the call prices even after that date.[45]

An argument which has been variously articulated by the District Court, the Court of Appeals, and the common stockholders runs to the effect that the Commission's method of valuation, which assigned no value to the common stock, amounts to giving the preferred the investment value it would have had in the absence of a § 11 liquidation, while giving the common something less than its investment value apart from the liquidation. As the District Court phrased it, "The argument for payment of the premium is comparable to dealing cards off the top of a deck. When full hands (based on theoretical 'investment value') have been dealt to all the senior security holders, the common would merely get whatever happens to remain. Under the Act the interests of all investors must be considered." 71 F. Supp. at 802.[46]

---

[45] The changes in interest rates which had occurred at the time of the decisions of the District Court and the Court of Appeals were merely cited to indicate that future changes might affect the accuracy of Badger's predictions.

[46] The Court of Appeals states that the Commission "made no finding as to the 'value' of the common stock," and that "the Commission ascribed 'investment value' to the preferreds but failed to make a similar approach to the common." 168 F. 2d at 737. Central-Illinois Securities Corporation and Christian A. Johnson, representing the common stockholders, complain that "the Commis-

The initial error in this argument is its assumption that the Commission deals from less than a full deck, that the impact of § 11 has caused losses to Engineers. For, if investment values have not been destroyed by the operation of § 11, giving the preferred stockholders the investment value of their shares will not deprive the common of any part of the investment value of their stock. We have already dealt with the hypothesis accepted by the District Court and the Court of Appeals that the impact of the Act prior to the liquidation involved here has caused losses by forcing the company to divest itself of its interests in numerous operating companies.[47]

In addition, however, it is said that value disappeared in the liquidation of Engineers itself, in spite of the fact that when Engineers' management came forward with a plan for the liquidation of Engineers, they had asserted that there was no economic justification for the continued existence of that corporation, in fact had characterized it as an "economic monstrosity." [48] In the light of the pres-

---

sion's determination of the equitable equivalent of the rights surrendered by Engineers' stockholders failed utterly to take account of the correlative rights of the preferred and common."

[47] See note 38 and text, *supra*.

[48] The Commission stated in its opinion that "Engineers has produced an abundance of evidence showing that once it has disposed of El Paso and Gulf, it will have no reason to continue as a separate corporate entity for it would then be the parent of a single operating company, Virginia. In that situation, Engineers admits that it would be an 'economic monstrosity' and all participants in this proceeding seem to be in agreement with that conclusion. The record does not clearly indicate what it will cost to maintain Engineers after Gulf States and El Paso have been divested. Estimates range from $172,000 to $365,000 a year. The company freely admits that Engineers could in no way justify any such continuing expenditure. Virginia is able to undertake its own financing and service and is large enough to stand independently. Any functions Engineers might perform should more properly be carried out by Virginia's own management." Holding Company Act Release No. 7041, p. 18.

ent record it seems futile to argue that the dissolution of Engineers injured the common stockholders by depriving them of the so-called advantages of "leverage," [49] diversity of investment and a centralized management, arguments which, incidentally, were largely rejected by Congress at the time of the passage of the Act.[50]    The record indicates

---

[49] "Leverage" is the term used to describe the advantage gained by junior interests through the rental of capital at a rate lower than the rate of return which they receive in the use of that borrowed capital.    Assuming that the hypothetical Engineers could have used to advantage the $39,000,000 in capital supplied by the preferred stockholders, the Commission could properly have found that such "leverage" was not worth the risk that earnings might drop below the amount required to pay dividends on the preferred, thereby endangering the junior equity of $66,768,148 (the market value of the securities received by the common under the plan, as of the date of consummation, less the amount paid in the exercise of Gulf warrants).

In the light of the facts stated in the following quotation from the Commission's opinion, it is highly unlikely that the hypothetical Engineers would have had use for the capital supplied by the preferred stockholders: "The retirement of the preferred stock will be of immediate benefit to the common stockholders.    As indicated above, the company at the time of the hearings had on hand idle treasury cash of over $14,650,000, while it is estimated that this sum will reach approximately $16,825,000 by the end of 1946. These funds have been accumulated through property dispositions and retained earnings.    The management has pursued a policy of withholding dividends on the common stock until it is satisfied that the system has made all the adjustments that will be required of it under the Holding Company Act.    As a consequence the company has now accumulated a large amount of idle funds while it continues to have outstanding three substantial issues of preferred stock having fixed dividend requirements.    Under the circumstances the elimination of this prior charge is highly beneficial to the common."    Holding Company Act Release No. 7041, p. 32.

[50] S. Rep. No. 621, 74th Cong., 1st Sess. 11–12; Additional Views by Representative Eicher, H. R. Rep. No. 1318, 74th Cong., 1st Sess. 46–47; Statement of House Managers, H. R. Rep. No. 1903, 74th Cong., 1st Sess. 70–71; Committee of Public Utility Executives, Summary of S. 2796, 74th Cong., 1st Sess., with Annotations, June, 1935, 5, 7.

that whatever tax advantage would be derived from reporting income on a consolidated basis was not commensurate with the cost of preserving Engineers.

Even if we could find that investment value had been destroyed by the liquidation of Engineers, or if we could find that the operation of the Act prior to the formulation of Engineers' plan had inflicted losses on the Engineers system and could take such losses into account, these facts would be irrelevant, except to the extent that such losses had impaired the investment value of Engineers' preferred by lowering its assets coverage or otherwise adversely affecting the economic prospects of the company apart from the Act. For the "fair and equitable" standard requires that, before the junior security holder may share, the senior security holder must receive the equitable equivalent of the rights surrendered, in this case the investment value. Since the investment value of the preferred must be measured in cash in this case, there is no occasion for "an examination of the correlative rights of the preferred and common stockholders." The rights of the common are not entitled to recognition until the rights of the preferred have been fully satisfied.

C. The District Court, with the apparent approval of the Court of Appeals, cast the standard of "fair and equitable" in the mold of "colloquial equities." Making payment of the preferred in excess of $100 per share unfair, it thought, were various "colloquial equities," which may or may not have had an incidental bearing on the investment value of the shares. The issuing price was one such factor. The "important consideration" was "not what the preferred security holders paid, but how much the company received for their stock," and since it was "practically certain" that the company received no more than $98 per share for any of the three series of preferreds and that the public paid no more than $100 per share, there was "no consideration of colloquial equity why the preferreds should be paid a premium." 71 F.

Supp. at 801. Other "colloquial equities" were the market history of the preferred,[51] the fact that earnings had been retained in the system, thus enhancing the value of the preferred at a sacrifice to the common,[52] and the hardship worked by the Act upon the common stock in the form of forced divestitures [53] and frustration of the enterprise.

In deciding the case on the assumption that "the inquiry is one of relative rights based on colloquial equity," and that the *Otis* case accorded participation to security holders "in accordance with the standard of colloquial equity," the District Court erred insofar as by "colloquial equities" it meant considerations which do not bear upon the investment or going-concern value the preferred would have absent the liquidation compelled by the Act. Congress, perhaps believing that the application of such an amorphous standard as that of "colloquial equity" was beyond the competence of courts and commissions, has instead prescribed the requirement that investment values be preserved.

## IV.

*The Escrow Arrangement.* As we have stated, the plan has been consummated by the payment to the preferred of $100 per share, and the difference between the amount paid and the amount which would be payable under the plan approved by the Commission has been deposited in escrow, together with an amount sufficient to give the

---

[51] See note 7, *supra*.

[52] Cf. *Continental Insurance Co.* v. *United States,* 259 U. S. 156, in which the principal issue was whether, when the charter provided that preferred and common should share equally on dissolution in the assets of the corporation, earnings retained in the systems should be regarded as assets and shared with the preferred in a dissolution forced by the antitrust laws. It was held that these retained earnings were assets and should be shared by the preferred.

[53] See note 38 and text *supra*.

preferred, during the period of the litigation, a return on the sum in escrow "measured by the return which would have been received by [the preferred stockholders] if the stock remained outstanding." [54]  The preferred stockholders, who received $100 per share at the time of the consummation of the plan, will thus receive, on the additional $5 or $10 per share held in escrow, substantially the same return they would have derived by the retention of $5 or $10 worth of Engineers' preferred stock.

But the preferred stockholders contend that the plan should not have been consummated until such time as they were paid in full the amounts due them in satisfaction of their claims; that, in addition to the principal amount in escrow and interest thereon, they should receive an amount equal to dividends on the $100 per share received at the time of consummation, to the date of payment of the $5 or $10 held in escrow.  Their argument is a technical one: it is said that the Commission actually applied the redemption provision to limit the amount of payment to them, since in the absence of that provision they would have been entitled to an investment value higher than the call prices; that by the terms of that provision the company had no right to terminate dividends except by payment of the full call prices.  The answer is that the Commission did not apply the redemption provision, which, like the involuntary liquidation provision, was inoperative, but held that fairness required that the preferreds be paid no more than the

---

[54] In escrow is the sum of $4,000,000, comprised as follows: $3,204,795, which is equal to $5, $10, and $10 per share respectively of the three series of preferred; $484,325, which is an amount equal to simple interest for three years at the rate of 4.76% on the $5 preferred, 5% on the $5.50 preferred, and 5.45% on the $6 preferred; $310,880, which will cover all fees and other compensation and all remuneration or expenses claimed in connection with the plan.

call price, since the company could have called the stock at that price at any time, absent the Act.

The total sum in escrow is not sufficient to meet the preferred stockholders' demand. It is not apparent how they could recover the difference between the sum in escrow and the sum they claim in this proceeding. But we need not learn, for the escrow provision adopted by the District Court on the recommendation of the Commission in order to expedite consummation of the plan was fair to the preferred stockholders.[55] The $100 per share received at the time of the consummation of the plan could have been invested in comparable securities

---

[55] The preferred stockholders object that the Commission failed to give them notice and an opportunity to be heard on the recommendation that an escrow be established. The escrow recommendation was made by way of an amending order, Holding Company Act Release No. 7190, and the Commission seems to have insisted throughout that its recommendation did not have the effect of amending the plan, but that the establishment of an escrow was within the power of the District Court. See note 13 *supra*. The District Court, which ordered the creation of the escrow, afforded the preferred stockholders a hearing on the propriety of that provision and upon whether the plan should be consummated prior to a final determination by the court of last resort of the amounts due the preferred stock. Applications for stay of consummation were denied in turn by the District Court, by the Court of Appeals and by a Justice of this Court. There was no occasion to hold a hearing on the question of whether the plan should be consummated by payment of $100 and the creation of an escrow at the time the Commission passed on the plan, for it approved the plan's provision for payment of $105 and $110. The necessity of deciding whether there should be consummation and an escrow first arose in the District Court. It was proper for the Commission, when it became apprised of determined opposition to the plan on the part of certain common stockholders, to recommend that the plan be consummated and that an escrow be created to protect the rights of the preferred, in the interest of expeditiously bringing the remnant of the Engineers system into compliance with the Act, without holding a hearing on the propriety of its recommendation. In the District Court and in the Court of Appeals, the preferred stockholders were accorded full hearing.

at the current rate of return. On the $5 or $10 per share held in escrow the preferred stockholders will receive, for the period between the date of consummation and the date of payment, a return which approximates the favorable rate of return they received on their preferred stock in Engineers. Their position is at least substantially the same as it would have been had they received $105 or $110 per share at the time of the consummation of the plan.

Our specific consideration has applied to the major features of difference between the Commission and the reviewing courts. In our opinion, in these respects, the Commission's action has not been contrary to law and its findings were sustained by adequate evidence. Consequently, in accordance with the views we have stated concerning the scope of judicial review, the Commission's order should have been sustained. We have considered other contentions advanced by the parties and find nothing in them which would warrant a different conclusion.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Justice Douglas and Mr. Justice Jackson took no part in the consideration or decision of this case.

## APPENDIX.

SECURITIES AND EXCHANGE COMMISSION'S DEVELOPMENT
AND APPLICATION OF INVESTMENT VALUE THEORY.*

The Commission first applied the investment value standard in a series of cases holding common stock entitled to participate with preferred in the new securities

---

*This Appendix is merely a summary of Commission decisions and does not purport to declare any rulings of law.

given to satisfy claims in the dissolving corporation, although in each case the book value of the corporation's assets was exceeded by the charter claims of the preferred.[1] This application of the standard was approved by this Court in *Otis & Co.* v. *Securities and Exchange Commission,* 323 U. S. 624. Satisfaction of preferred claims at less than their face amount by payment partly in cash and partly in new securities has also been approved by the Commission.[2] In other cases holding that, in the circumstances of the particular case, retirement of preferred stock having a call or voluntary liquidation price in excess of the involuntary liquidation price by payment in cash at the latter price is fair and equitable, the Commission has considered a number of factors other than charter provisions.[3]

In a number of contemporaneous cases, the Commission approved plans which provided for liquidation of bonds by payment in cash at the face amount of the bonds

---

[1] *Community Power and Light Co.,* 6 S. E. C. 182; *Federal Water Service Corp.,* 8 S. E. C. 893; *United Power and Light Co.,* 13 S. E. C. 1 (the *Otis* case); *Puget Sound Power & Light Co.,* 13 S. E. C. 226; *Southern Colorado Power Co.,* Holding Company Act Release No. 4501; *Virginia Public Service Co.,* Holding Company Act Release No. 4618. These cases are discussed in Dodd, The Relative Rights of Preferred and Common Shareholders in Recapitalization Plans Under the Holding Company Act, 57 Harv. L. Rev. 295. Commissioner Healy, who concurred in the result in the *Community Power Case,* dissented in the other cases, contending that the claim of the preferred was measured by the contract right. His view of the meaning of § 11 (e) led him to dissent in cases involving applications of the investment value rule which produced the results reached in this case. See text at note 6, *infra.*

[2] *New England Power Assn.,* Holding Company Act Release No. 6470, 66 F. Supp. 378, affirmed *sub nom. Lahti* v. *New England Power Assn.,* 160 F. 2d 845.

[3] *Cities Service Co.,* Holding Company Act Release No. 4944, pp. 16–17; *Georgia Power & Light Co.,* Holding Company Act Release No. 5568, pp. 16–17, 20–27.

without premium.[4] Even in the earliest of these cases, in addition to holding that the indenture provision requiring payment of a premium in the event of voluntary call was inapplicable, the Commission observed the absence of other legal or equitable considerations which might have made payment of a premium fair and equitable.[5] And in the later cases, the Commission's opinions "emphasized such circumstances, not articulated in the earlier cases, as the interest rate, maturity date, and risk factors incident to the particular security which is to be prepaid as bearing upon the fairness of the proposed discharge of the security." *American Power & Light Co.,* Holding Company Act Release No. 6176, p. 12.

In *American Power & Light Co.,* Holding Company Act Release No. 6176, the Commission applied the investment value theory to allow payment of premiums on bonds retired under compulsion of § 11 (e). After pointing out the trend observed in the preceding paragraph and attributing it to experience gained in considering a large number of cases, the Commission held that the investment value theory should be applied where its application resulted in the payment of the bonds at prices in excess of their face value. Commissioner Healy, who had persistently dissented in the line of cases finally approved by this Court in the *Otis* case,[6] dissented

---

[4] *The United Light and Power Co.,* 10 S. E. C. 1215, 1222, affirmed *sub nom. New York Trust Co.* v. *S. E. C.,* 131 F. 2d 274; *North American Light & Power Co.,* 11 S. E. C. 820, 824, affirmed *sub nom. City National Bank & Trust Co.* v. *S. E. C.,* 134 F. 2d 65; *North Continent Utilities Corp.,* Holding Company Act Release No. 4686, p. 12, approved and enforced, 54 F. Supp. 527; *Consolidated Electric & Gas Co.,* Holding Company Act Release No. 4900, p. 7, approved and enforced, 57 F. Supp. 997, affirmed *sub nom. Massachusetts Mutual Life Insurance Co.* v. *S. E. C.,* 151 F. 2d 424.

[5] *The United Light and Power Co.,* 10 S. E. C. 1215, 1222; *North American Light & Power Co.,* 11 S. E. C. 820, 824.

[6] See note 1, *supra.*

vigorously. He contended that the *Otis* case should be limited to its facts and that the earlier cases refusing to require payment of premiums on bonds should be taken as holding that payment of bonds at their face amount without premium "was fair because . . . contract rights were satisfied, not because the debentures were valued and found to be worth their principal." *Id.* at 46.[7] He thought it highly significant that a consistent application of the investment value standard would require retirement of bonds at less than their principal amount, in cases in which the bonds were not "worth their principal," and that the Commission had not suggested that its approach should extend so far. *Id.* at 47–48.[8]

Less than one year later the Commission made a parallel application of the investment value theory to a case involving the retirement of noncallable preferred stock, holding unfair a plan providing for the retirement of that stock by payment in cash equivalent to the liquidation preference. *The United Light and Power Co.,* Holding Company Act Release No. 6603. Commissioner Healy, who died November 16, 1946, dissented, stating for the last time his view that the claim should be paid at its liquidation preference, *i. e.,* that the contract controlled.[9] After this decision, in which the Commission

---

[7] While contending that the majority's approach was not consistent with the cases refusing to allow premiums, he admitted "that a close reading of the Commission's opinions in those cases discloses some language which the investing public may or may not have realized vaguely heralded the present doctrine." Holding Company Act Release No. 6176 at p. 47.

[8] The Commission, in its brief in the case at bar, declines to predict what it would do if faced with the problem suggested by Commissioner Healy, asserting that much would depend on the exact nature of the security and the circumstances of the particular case.

[9] Commissioner Healy's position is explained in the following statement: "When I signed the Report of the National Power Policy

divided 3–2,[10] a rehearing was granted. While decision on rehearing was pending, the company proposed a substitute voluntary proposal, which the Commission approved. *United Light and Railways Co.*, Holding Company Act Release No. 7951.

The next application of the investment value theory employed by the Commission's majority was made in this case, decided December 5, 1946. Since this decision and the decision of the Court of Appeals on review, the Commission has again applied the investment value theory to require payment of preferred stock in cash at investment values equal to call prices. *Pennsylvania Edison Co.*, Holding Company Act Release No. 8550.

In a number of cases the Commission has approved plans which provided for the payment of preferred stock at call prices, where there was no contention that the premium was not payable.[11] But these cases have not been regarded as precedents in cases in which the company resists payment of the preferred stock or bonds in amounts in excess of the face value or involuntary liquidation price. *United Light and Power Co.*, 10 S. E. C. 1215, 1227.

---

Committee to President Roosevelt I understood the much quoted reference to preservation of investment values to refer to the values of operating company securities in holding company portfolios. I did not then and do not now believe it was intended as a basis for denying the senior security holders their full priority rights or for compelling common stockholders to pay premiums upon the redemption or retirement of senior securities forced by federal statute." *The United Light and Power Co.*, Holding Company Act Release No. 6603, pp. 43–44.

[10] Commissioner Caffrey thought the liquidation preference applicable for a reason irrelevant here. See *El Paso Electric Co.*, Holding Company Act Release No. 5499.

[11] E. g., *Minnesota Power & Light Co.*, Holding Company Act Release No. 5850; *Mississippi River Power Co.*, Holding Company Act Release No. 5776; *The North American Co.*, Holding Company Act Release No. 5796.