## In re ELECTRIC BOND & SHARE CO.

United States District Court
S. D. New York.
Jan. 24, 1951.

Harry G. Slater, Washington, D. C., Chief Counsel, Securities and Exchange Commission.

Simpson Thacher & Bartlett, New York City, by Richard Jones, New York City, for Electric Bond & Share Co.

Hawkins, Delafield & Wood, New York City, by John F. B. Mitchell, Jr., New York City, for Cornell Committee.

Debevoise, Plimpton & McLean, New York City, by A. Fairfield Dana, New York City, for John Hancock Mut. Life Ins. Co.

. Samuel Okin, pro se.

Percival E. Jackson, New York City, for Electric Bond & Share Co. $6 Preferred Stock Certificates Committee.

Paul J. Kern, New York City, for certain $5 preferred stockholders of Electric Bond & Share Co.

McGOHEY, District Judge.

The Securities and Exchange Commission, pursuant to §§ 11(e) and 18(f) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. §§ 79k(e), 79r(f), applies for approval and enforcement of a plan.

Upon consideration of the oral arguments and the helpful briefs submitted by counsel I am of the opinion that the Commission's findings and conclusions upholding the plan as fair and equitable are based on substantial evidence and were reached by application of the proper legal standards. Accordingly, the plan is approved.

The prior history of this holding company simplification is set forth in Judge Leibell's opinion[1] relating to Plan II–A. The following constitutes a sufficient setting for the present proceeding.

The Commission, in connection with its approval of Bond and Share's Plan I on October 10, 1945, found that the elimination of the corporation's preferred stocks was necessary to effectuate the provisions of §§ 11(b) (1) and 11(b) (2) of the Act. At that time Bond and Share had outstanding, in addition to 5,250,357 shares of common stock, 840,268 shares of $6 preferred stock and 203,012 shares of $5 preferred stock.

The preferred stocks ranked *pari passu* and were entitled to cumulative annual dividends of $6 and $5 per share respectively. Upon "any liquidation, dissolution or winding up of the affairs of the corporation or

---

1. In re Electric Bond and Share Co., D.C., S.D.N.Y., 73 F.Supp. 426.

any distribution of its capital, whether voluntary or involuntary" each class of preferred was entitled to $100 per share plus accrued dividends.[2] Each class, "upon the affirmative vote of the holders of record of a majority of the shares of the issued and outstanding common stock," could be called at the redemption price of $110 plus accrued dividends.[3]

Pursuant to Plan I, Bond and Share, on November 23, 1945, paid $30 per share as a first step in the retirement of the preferred. Retirement was completed on March 6, 1947, under Plan II-A, pursuant to which Bond and Share paid an additional $70 per share and accrued dividends. It also issued certificates evidencing the right of the holders to receive whatever additional amounts, if any, to which they might thereafter be held to be entitled. Plan II-A provided that within four months Bond and Share was to file another plan specifying what further payments, if any, it proposed to make.

In accordance with that provision, Bond and Share, on April 7, 1947, filed Plan II-B which proposed that no further payments be made to the certificate holders. The Commission held public hearings on the plan, heard argument and reargument and received briefs. Bond and Share, the Commission, two committees of certificate holders and another certificate holder were all represented at these hearings.

On June 19, 1950, the Commission issued its order [4] which provided, *inter alia:*

"(1) The terms and provisions of Plan II-B in so far as said Plan proposes to pay no further amount of cash or other assets of Bond and Share to the holders of the certificates issued with respect to the $6 Preferred Stock be and hereby are disapproved as unfair and inequitable;

"(2) Bond and Share be and hereby is authorized and directed to pay and distribute to the holders of the certificates issued with respect to its $6 Preferred Stock the amount of $10.00 for each share of said $6 Preferred Stock represented by said certificates, together with compensation for the delay in the payment of said amount at the rate of 5.45% per annum from March 6, 1947, the effective date of Plan II-A, to the date of payment.

"(4) The terms and provisions of Plan II-B in so far as said Plan proposes to pay no further amount of cash or other assets of Bond and Share to the holders of the certificates issued with respect to the $5 Preferred Stock be and hereby are approved as fair and equitable, and said certificates be and hereby are deemed null and void."

The Commission issued its findings and opinion on July 28, 1950, and thereafter denied petitions for rehearing by Bond and Share and by certain $5 certificate holders.

On August 4, 1950, Bond and Share filed its amendment conforming Plan II-B to the Commission's determination and, while reserving the right to contest the decisions directing the $10 payment to the $6 certificate holders and awarding compensation for delay in payment, requested the Commission to make this application for enforcement of Plan II-B as so amended.

The Commission is required by § 11(e) of the Act, in order to approve a plan, to "find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan." There is no question here with regard to the Commission's determination that retirement of the preferred stocks is necessary to effectuate the provisions of the Act. The sole issue is the fairness and equity of the plan.

Both Bond and Share and Samuel Okin, a holder of 9,000 shares of Bond and Share common stock, contend that the plan is unfair and inequitable insofar as it provides for the additional payment of $10 to the $6 certificate holders and compensation for delay in payment at the annual rate of 5.45%. Certain $5 certificate holders ob-

---

2. Electric Bond and Share Charter, § 3(b). For text see note 7 infra.

3. Electric Bond and Share Charter, § 3(c). For text see note 8 infra.

4. The Commission withheld its order and decision pending the Supreme Court's decision in Securities & Exchange Commission v. Central-Illinois Securities Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836, decided June 27, 1949.

ject to the failure to provide for additional payment to them.

■ The scope of judicial review of Commission action in this type of proceeding has been set out in the Engineers case.[5] The Supreme Court there said: "Administrative finality is not, of course, applicable only to agency findings of 'fact' in the narrow, literal sense. The Commission's findings as to valuation, which are based upon judgment and prediction, as well as upon 'facts,' * * * are not subject to reexamination by the court unless they are not supported by substantial evidence or were not arrived at 'in accordance with legal standards.'" [6]

## I

Bond and Share's first argument is two-fold. First, it maintains that § 3(b) [7] of its charter should have been given controlling effect by the Commission so as to fix the value of the preferred at $100 because the retirement would have been accomplished under its provisions absent the impact of the Act. This portion of the argument

must fail because it is evident from a mere reading of §§ 3(b) and 3(e) [8] of the charter that even if Bond and Share had, as a matter of business judgment apart from the Act, sought to retire the preferred it could not have done so under § 3(b) but would have had to do so under § 3(e).

Clearly, § 3(b) contemplates a situation in which after payment of $100 per share to the preferred there is at least some payment or distribution to the common. What occurred here was no more than elimination of the preferred, and the manner in which that is to be done is set out in § 3(e). Adoption of Bond and Share's interpretation of these charter provisions would render meaningless the latter section.

■ The foregoing also disposes of the second portion of Bond and Share's charter argument which is that § 3(b) of the charter could have been employed to effect the retirement of the preferred at $100 and, therefore, the Commission committed error in applying the $110 redemption price of § 3(e) of the charter as a ceiling upon value

5. Securities & Exchange Commission v. Central-Illinois Securities Corp., 338 U. S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836.

6. Id. 338 U.S. at page 126, 69 S.Ct. at page 1393.

7. "In the event of any liquidation, dissolution or winding up of the affairs of the corporation or any distribution of its capital, whether voluntary or involuntary, before any distribution shall be made to the holders of the common stock, each holder of the $6 preferred stock and/or $5 preferred stock shall be entitled *pari passu* to be paid on each share of such stock held by him the sum of $100 plus in the case of $6 preferred stock the amount, if any, by which $6 per annum from the date after which dividends on said share became cumulative to the date of such distribution exceeds the dividends actually paid thereon and plus in the case of $5 preferred stock the amount, if any, by which $5 per annum from the date after which dividends on said share became cumulative to the date of such distribution exceeds the dividends actually paid thereon. After such payment to the holders of the $6 preferred stock and $5 preferred stock, the remaining assets and funds of the corporation (subject to the rights of any class of stock hereafter au-

thorized) shall be divided and distributed among the holders of the common stock alone according to their respective shares."

8. "Upon the affirmative vote of the holders of record of a majority of the shares of the issued and outstanding common stock at any annual meeting or at any special meeting called for that purpose, the $6 preferred stock or the $5 preferred stock, or both thereof, may be called for redemption in whole or in part at any time at one hundred and ten dollars ($110) for each share of the $6 preferred stock redeemed, plus the amount, if any, by which $6 per annum upon such share from the date after which dividends thereon became cumulative to the date of redemption exceeds the dividends actually paid thereon or declared and set apart for payment thereon from such date to the date of redemption and at one hundred and ten dollars ($110) for each share of the $5 preferred stock redeemed, plus the amount, if any, by which $5 per annum upon such share from the date after which dividends thereon became cumulative to the date of redemption exceeds the dividends actually paid thereon or declared and set apart for payment thereon from such date to the date of redemption * * *."

rather than the $100 liquidation or distribution of capital price of § 3(b).

## II

▮ Fairness and equity require that the preferred stockholders receive the investment value of their stock on a going-concern basis.[9] The Commission determined that value as of March 6, 1947, the date of the $70 payment, noting, however, "that there was no substantial difference in the investment value of Bond and Share's preferred stocks in November 1945 and March 1947." In making that determination the Commission considered in detail the asset coverages of the preferred stocks and their earnings coverages both in terms of Bond and Share's own corporate earnings and the earnings of the Bond and Share system as a whole. In the latter connection the Commission assumed the future consummation of the then pending reorganizations of American and Foreign Power Company, Inc., American Power and Light Company and Electric Power and Light Corporation, all subsidiaries of Bond and Share.

▮ It seems clear to me that the Commission's findings are sufficiently complete under the circumstances and are based upon substantial evidence.

▮ The assertion that the findings are based on "untenable hypotheses" and "unwarranted assumptions" rather than on certain facts stressed by Bond and Share amounts to no more than an argument as to the weight to be given to various factors in appraising investment value and not to the substantiality of the evidence. The alleged "untenable hypotheses" and "unwarranted assumptions" are conclusions which the Commission reached after weighing facts which Bond and Share emphasizes together with other facts which, in the Commission's judgment, affected the weight to be given to those emphasized. For example, Bond and Share says that the preferred stocks were highly speculative because, among other things, the annual corporate earnings coverage has been poor for about fifteen years. The Commission considered this argument but found for stated reasons which it was entitled to consider that the record of past corporate earnings here was "of relatively small significance." Obviously, it was not error for the Commission, in the exercise of its judgment, to differ from Bond and Share in its assessment of the weight to be given to the earnings record.

▮ It is argued that the Commission committed legal error in assuming future consummation of the pending reorganizations of the three subsidiaries in considering system earnings as an element of investment value, but it is difficult to see what else could reasonably have been done. These pending reorganizations were relevant existing facts on the valuation date. It was the duty of the Commission to make reasonable inferences from those facts and it did so. That an expert body's inferences differ from those drawn by expert witnesses for one of the parties hardly amounts to legal error.

▮ A related argument is that the Commission erred in taking into account the impact of the Act so far as it compelled the reorganizations of the three subsidiaries, but that since it did so it should also have recognized that the Act required divestiture of securities to be received by Bond and Share as a result of those reorganizations, and that the proceeds from such divestitures could not be invested profitably. This argument is based upon a misinterpretation of the investment value principle. Under that principle the preferred stockholders are to receive the going-concern value of their securities. Thus it must be assumed that Bond and Share will continue as before—that is, as if the retirement of the preferred were not being accomplished. However, in order to determine the going-concern value, it is necessary to take into account the value to Bond and Share of its holdings. A relevant element to be considered in determining

---

9. Securities & Exchange Commission v. Central-Illinois Securities Corp., note 5 supra; Otis & Co. v. Securities and Exchange Commission, 323 U.S. 624, 65 S. Ct. 483, 89 L.Ed. 511; In re Pennsylvania Edison Co., 3 Cir., 176 F.2d 764, 768.

that value is the fact that the three reorganizations were pending. But it is only the fact of the reorganizations that is relevant. That they were compelled by the Act is merely incidental. The impact of the Act is to be disregarded only as it affects the reorganization of Bond and Share, not its subsidiaries. Consequently, divestments of securities required of Bond and Share itself by the Act are to be disregarded. To do otherwise would be to treat Bond and Share upon something other than a going-concern basis. Moreover, the argument assumes that investment of the proceeds of the securities to be disposed of will result in an unfavorable return. This is merely a quarrel with the Commission's judgment which is not subject to review.

For the foregoing reasons, the arguments based upon disagreement with the Commission's view as to when the impact of the Act should be taken into account in determining investment value must be rejected.[10]

The remaining contentions with regard to the Commission's valuation of the $6 preferred appear to me to be without merit since they are no more than attacks upon the exercise of its "judgment and prediction".[11]

■ It is said next that the Commission erred in basing its investment value appraisal on stock yield levels prevalent during the period between November, 1945, and March, 1947, because that was a period of abnormally high market values of a temporary nature. This contention is based on the following statement in the Engineers case (Securities & Exchange Comm. v. Central-Illinois Securities Corp.) 338 U.S. at page 146, 69 S.Ct. at page 1403: "We may concede that even though the preferred is to be paid in cash and thus should receive cash sufficient to purchase a comparable investment with a comparable

yield, the Commission would be wrong in selecting, as a basis for valuation, abnormal or highly speculative market values of a transient nature."

But in the Engineers case the Supreme Court held that January, 1946, was not an improper valuation date under that standard, and the Court of Appeals for the Third Circuit in Pennsylvania Edison Co.,[12] likewise rejected the argument that June 30, 1946, should not have been used as the valuation date. Market levels on both of these dates were higher than they were either in November, 1945, or March, 1947. The fact that market levels declined after March, 1947, is irrelevant in determining whether the Commission selected an improper date "for the preferred stockholders could not be required to surrender their investment and their advantageous dividend rate and yet remain subjected to the risk of fluctuation in the value of their erstwhile investment."[13]

It seems clear that the Supreme Court's statement refers to unusual market fluctuations of comparatively short duration rather than the type of market level situation prevailing during the period here under consideration. Consequently, I think there was no error in fixing the valuation date here. And since, in the Commission's judgment, based on substantial evidence, there was no substantial difference in the investment value of the preferred in November, 1945, and March, 1947, it was justified in determining investment value primarily as of the latter date.

### III

■ The objection to the award of compensation for delay in payment to the holders of the $6 certificates is untenable under the doctrine of Securities & Exchange Commission v. Central-Illinois Securities Corp., supra, and In re Pennsylvania Edison Co., supra.

10. Securities & Exchange Commission v. Central-Illinois Securities Corp., note 5 supra, 338 U.S. at pages 139–143, 69 S.Ct. 1377.

11. Note 6 supra.

12. Note 9 supra.

13. Securities & Exchange Commission v. Central-Illinois Securities Corp., note 5 supra, 338 U.S. at page 148, 69 S.Ct. at page 1404.

## IV

The holders of the $5 certificates argue that they are entitled to additional compensation because they were misled into believing that such compensation would be awarded. There is no merit whatever to this contention. The $5 certificates, dated March 6, 1947, bear the following legend in red letters approximately one-eighth of an inch high: "This Certificate Will Have Value Only In The Event That It Is Finally Determined That An Additional Amount Is Due With Respect To The Preferred Stock Of Electric Bond And Share Company, As Hereinafter Set Forth; Otherwise This Certificate Will Have No Value."

Moreover, on April 7, 1947, just one month after the date of the certificates, Bond and Share filed Plan II–B which proposed that no additional payments be made to the certificate holders. This surely was adequate notice of the great risk involved in assuming that the certificates had any worth.

The next contention is that the $5 certificate holders should be permitted to submit expert testimony in support of their claim for additional compensation. The only reason given for this request is that these certificate holders were "compromised by dual representation" before the Commission. It is true that holders of both the $5 and $6 certificates were represented by the same counsel at the hearings and that they are represented separately here because the $6 certificate holders are, of course, supporting the Commission's determination. The $5 certificate holders, however, were or should have been aware that a conflict of interest might develop. Nevertheless they chose to proceed. They were represented by counsel of their own choosing, they do not charge their counsel with dereliction or misconduct and

I find that there was none. Mr. Kimber testified as an expert in support of their position with regard to the investment value of the $5 preferred. They have had their day in court. They have not advanced any convincing reason why they should have another.

Finally, it is argued that the redemption provisions of § 3(e) of the charter give the $5 certificate holders a contract right to a $110 valuation here. This argument is rejected on the authority of the Otis case since the Commission has found upon substantial evidence that the retirement of the preferred resulted from the impact of the Act.[14]

These certificate holders are entitled to the investment value of their stock on a going-concern basis.[15] The Commission, while recognizing "that somewhat lower yields are usually applicable to the lesser dividend of two or more preferred stocks ranking pari-passu" found that although the differential existed here it was not sufficient to support an investment value of more than $100. This finding, like that with respect to the $6 preferred, is based upon substantial evidence and was arrived at in accordance with legal standards. Accordingly, it will not be disturbed.

There has been no denial of equal protection of the laws nor has there been an expropriation of property without due process. That the $5 and $6 preferred rank *pari passu* under the charter means no more than that neither is entitled to priority over the other. Each has been awarded its investment value in accordance with methods and principles approved by the Supreme Court.

Other issues raised by the parties have been considered. They do not require additional comment.

Application granted. Settle decree.

---

14. "Where pre-existing contract provisions exist which produce results at variance with a legislative policy which was not foreseeable at the time the contract was made, they cannot be permitted to operate." Otis & Co. v. Securities and Exchange Commission, note 9 supra, 323 U.

S. at page 638, 65 S.Ct. at page 490; Securities & Exchange Commission v. Central-Illinois Securities Corp., note 5 supra; In re Pennsylvania Edison Co., note 9 supra.

15. Note 9 supra.